**WEATHER TAMER, INC. and Tuskegee Garment Corporation,**
**Petitioners-Cross-Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent-Cross-Petitioner.**

No. 80–9034.

United States Court of Appeals, Eleventh Circuit.

May 17, 1982.

---

Bass, Berry & Sims, William N. Ozier, Nashville, Tenn., for petitioners-cross-respondents.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Susan L. Dolin, Washington, D. C., for respondent-cross-petitioner.

James R. Goldberg, Atlanta, Ga., Max Zimny, New York City, for Intern. Ladies' Garment Workers' Union, AFL–CIO.

Before RONEY and FAY, Circuit Judges, and EDENFIELD *, District Judge.

FAY, Circuit Judge:

Weather Tamer, Inc. and Tuskegee Garment Corporation petition for review and the National Labor Relations Board cross-petitions for enforcement of an order of the Board[1] which adopted with modifications the findings and conclusions of the Administrative Law Judge that the companies violated § 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1976). The International Ladies' Garment Workers' Union, AFL–CIO (the Union) has intervened to seek enforcement of the Board's order. We conclude that there is substantial evidence in the record to support the § 8(a)(1) findings; however, the § 8(a)(3) and § 8(a)(5) findings are not supported by substantial evidence. Enforcement of the Board's order is granted in part and denied in part.

---

* The Honorable Newell Edenfield, U. S. District Judge for the Northern District of Georgia, sitting by designation. This case is being decided by a quorum due to the death of Judge Edenfield on December 26, 1981. 28 U.S.C. Section 46(d).

1. The decision and order appears at 253 N.L. R.B. 36 (Nov. 14, 1980).

Weather Tamer, Inc. is a manufacturer of children's clothing with a main plant located in Columbia, Tennessee and two other plants located in Lewisburg, Tennessee and Athens, Alabama. The Athens and Lewisburg plants are located sixty and twenty-five miles, respectively, from the Columbia facility. Prior to October, 1978, Weather Tamer also operated a plant in Tuskegee, Alabama, the Tuskegee Garment Corporation. It was approximately 300 miles from the main plant.

The findings of unfair labor practices were based on actions and conduct of management during and after a unionization drive at the Tuskegee plant in July and August, 1978. At that time Steve Kennedy was the plant manager of Tuskegee Garment and Eugene Heller was the president of Tuskegee Garment and the vice-president of Weather Tamer.

Management first learned of union activity at Tuskegee Garment on July 18, 1978, when the union presented Kennedy with a demand for recognition. After the demand for recognition was refused, an election was scheduled to be held on September 15, 1978. Between those two dates work at Tuskegee Garment gradually came to a halt. As they completed their work on the fall line of clothing then in process, the employees were laid off and work for the spring line of clothing was not delivered to the plant. After August 29th the plant was operated by a skeleton workforce, and as of September 9th only two employees remained on the payroll. Also during August a sign which read "Applications taken here" was replaced with one reading "No more applications being accepted," and a "Weather Tamer" sign was removed from the outside of the Tuskegee facility and sent to the Lewisburg plant then under construction.[2]

Despite a vigorous anti-union campaign by company officials, the employees voted for the Union on September 15th. The Union was certified to be the collective bargaining representative of the production employees on September 25th, and on September 29th it made a request to President Heller to meet and negotiate. Counsel for Weather Tamer responded on October 9th, advising the Union that the Tuskegee plant was permanently closed and that Weather Tamer was willing to bargain over the effects of the decision to close on the employees of the bargaining unit. Certain information requested by the Union was refused on the basis that it dealt with the decision to close the plant which was a subject of pending unfair labor charges. A single negotiating session was held on November 2nd at which the Union's requests for severance and vacation pay and to reopen the plant were refused.

The Board and the Administrative Law Judge found that Weather Tamer and Tuskegee Garment Corporation committed unfair labor practices by coercively interrogating employees, threatening plant closure, closing the plant in reprisal against the Union, and refusing to bargain over the decision to close the plant. In addition to cease and desist provisions, the Board's order affirmatively requires Weather Tamer to reopen the Tuskegee plant, reinstate the discharged employees, and make them whole for their loss of wages.

*The Anti-Union Campaign at Tuskegee— Section 8(a)(1)*

In reviewing the merits we are bound by the Board's factual determinations if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). If the Board has made a "plausible inference from the evidence" we may not overturn its findings, although if deciding the case *de novo* we might have made contrary findings. *Sturgis Newport Business Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir. 1977).

2. The Lewisburg plant was opened and began operation in a leased facility in February, 1977. In January, 1978, Weather Tamer began construction on a new building to house the Lewisburg operation. The building was erected and under roof by June, 1978, and production began in the new building in November, 1978. Production of garments in the leased facility continued until the transfer of operations to the new facility.

Section 8(a)(1) makes an unfair labor practice of employer actions which "interfere with, restrain, or coerce" employees in the exercise of their right of self-organization. 29 U.S.C. § 158(a)(1). President Heller and Plant Manager Kennedy were found to have violated this section by making statements to the employees which contained threats of plant closure. Several speeches and a letter were found to contain such threats.

Clearly an employer's threat to close a plant if the employees vote to be represented by a union is a violation of § 8(a)(1). *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–19, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); *TRW–United Greenfield Division v. NLRB*, 637 F.2d 410, 418 (5th Cir. 1981). On the other hand, it is not a violation to close a plant for legitimate economic reasons and an employer is entitled to campaign against a union. Section 8(c) permits an employer to express his "views, argument, or opinion" regarding unions as long as his communications to employees contain "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The employer may speak against unions in general or against the particular union seeking representation, and he is entitled to make predictions regarding the effects he perceives unionization will have on the operation of his plant. *Gissel*, 395 U.S. at 617–19, 89 S.Ct. at 1918, 1941–42. Such predictions, however, "must be carefully phrased on the basis of objective fact" and if there is any implication that action may be taken by the employer for reasons unrelated to economic necessities, "the statement is no longer a reasonable prediction based on available facts but a threat of retaliation." *Id.* at 618, 89 S.Ct. at 1942.

The line between conduct permitted under § 8(c) and that prohibited under § 8(a)(1) is often finely drawn. An evaluation of the employer's comments "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617, 89 S.Ct. at 1941. In making this inquiry the background against which the complained of actions take place must be considered. *TRW–United Greenfield*, 637 F.2d at 415–16; *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). "The scope of inquiry must encompass the entire pattern of employer conduct. Remarks that may not appear coercive when considered in isolation may take on a different meaning when evaluated with respect to the totality of the circumstances." *NLRB v. Kaiser Agricultural Chemicals*, 473 F.2d 374, 381 (5th Cir. 1973). Moreover, the test is not whether the employer actions actually have the effect of restraining or coercing employees, but whether they would tend to have such an effect. *Laredo*, 613 F.2d at 1340–41; *Delco-Remy Division, General Motors Corp. v. NLRB*, 596 F.2d 1295, 1309 (5th Cir. 1979).

President Heller made four speeches to the Tuskegee employees during the period between the Union's demand for recognition and the representation election. The Administrative Law Judge credited testimony that during the first two speeches made in July, Heller remarked that "he didn't want a union; and he would close down if the union came in," that "a union could put [the employees'] job[s] in jeopardy" because it would drive up the prices of clothing so that "there wouldn't be no point in making them," and that a company previously operated at the Tuskegee site went out of business because the company was unionized.

The third speech, given on August 17th, included the following:

First of all, you should know that there is no way that the Union can guarantee a single job or a single paycheck for the employees of this plant. Each of you has a job here today because we are able to produce a quality product at a competitive price which our customers are willing to purchase. Anything which interferes

with our ability to produce good garments at competitive prices can have a serious effect on the furture [*sic*] of this plant.

. . . .

It is our desire to continue the operation of this plant as long as it is economically feasible and as long as work is available. I would hate to see *any* group of outsiders come into this plant and cause the interference and disruptions which would prevent us from attaining that goal.

General Counsel's Exhibit # 24.

The fourth and final speech by Heller was given on September 13th, two days before the election and after all production employees had been laid off.

Unions like the ILGWUA are trying to convince employees like you in the south that companies are trying to take advantage of you [by] paying you lower wages than are paid by manufacturers in the northeast. The truth is that every day, manufacturers in the northeast are going out of business because the wages and the so-called benefits that they pay have priced them out of the market. I think that all of us realize that it is much better to earn good wages and benefits and have steady work than it is to have a higher wage rate and benefits on paper only but with no work to do. Is that clear to everyone. We are extremely hopeful that in the next few weeks increasing orders for the spring line will enable us to call our employees back to work here in Tuskegee. We know that we will be in a much better position to obtain new work and to deliver garments on time without the interference of the ILGWUA.

. . . .

. . . . Whether or not the union wins this election on Friday will not determine the future of this plant in Tuskegee. However, I know that our future and your future as an employee of this company will be much brighter without the interference and disruption that this union or any other union always brings into a plant and a community.

General Counsel's Exhibit # 43.

Heller concluded this speech by explaining the unfair labor charges which had been filed against the company.

Ok, that you are charged that the threatened employees says their jobs were in jeopardy if they voted yes in the union election. Now as far as that part is concerned if telling the truth is a threat I don't know but we have tried to be absolutely honest with everyone of you. We put a lot of this stuff in writing and you'll notice I've been reading most of this stuff and generally . . . . what I say I will stand behind, any of you feel that you are threatened . . . I doubt it, I don't think so. "We threatened to close the plants if the Union came in." Ok, there too we are trying to be absolutely honest and straight with you but we are not going to tell you fairy tales, we are not going to tell you if the garments cost more than for what we sell them for if we're to keep running the plant, and if anybody does tell you that you know and you believe them, its your own fault.

General Counsel's Exhibit # 43.

Heller also mailed a letter to all employees on September 5th, which had attached a list of companies which had been put out of business by foreign competition. The letter contained the following remarks:

Although we have recently suffered a reduction in work, we are hopeful that we will be able to secure new work within the next few weeks and return everyone to full employment. There is no way that the union can help us find or keep work in our plant.

The best job security that you have is a *NO* vote on September 15.

General Counsel's Exhibit # 17.

Plant Manager Kennedy gave a short speech on August 10th in which he notified the employees of the time and place of the upcoming election. He then remarked:

I know that most of you have heard all kinds of claims and promises about what the union can do for you. You owe it to

yourself and your family to find out the facts on both sides before you vote. The outcome of this election will affect your future as an employee of this company. General Counsel's Exhibit # 31.

■ Although several of the statements complained of are couched in terms of the employer's opinion of the deleterious effects a union would have on the competitive position of the Tuskegee plant, they are not "carefully phrased on the basis of objective fact." *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942. During the time period in which the statements were made, work at Tuskegee was coming to a halt and the employees were being laid off. By the time of the last speech all of the production employees had been laid off "indefinitely." Against such a backdrop, the clear implication was that the employees' continued employment and the plant's reopening were contingent upon a vote against the Union. Heller's assurance to the employees in his September 13th speech that the outcome of the election would not determine the future of the Tuskegee plant could not, under these circumstances, remove the threatening import of his other messages. We therefore affirm the holding of the Administrative Law Judge and the Board that these statements violated § 8(a)(1).

Two instances of employer questioning were also found to violate § 8(a)(1). Supervisor Derco asked one employee why she was not wearing a union pin and whether she and her fellow employees had signed union cards. Another employee was asked by President Heller to explain why she would vote for the union and jeopardize other employees' jobs.

■ Employers are permitted to talk to their employees and to question them about their union activities so long as the conversation is not threatening or coercive in violation of § 8(a)(1). In judging the likely impact of such a conversation, the totality of the circumstances surrounding the conversation must be considered. *TRW–United Greenfield*, 637 F.2d at 416; *Laredo*, 613 F.2d at 1342; *Delco-Remy*, 596 F.2d at 1309.

■ Considering the strong stance taken against the union by the employer, the plant shutdown in process at the time of the questioning, and the actual content of the conversations between the employer and the employees, we conclude that substantial evidence supports the findings that the conversations violated § 8(a)(1).

*The Plant Closing—Section 8(a)(3)*

■ Weather Tamer and Tuskegee Garment were found to have violated § 8(a)(3) and § 8(a)(1) by laying off the production workers and closing the Tuskegee facility in reprisal for the employees' election of the Union as its bargaining agent.[3]

■ A partial closing such as this must be evaluated according to the standards of *Textile Workers v. Darlington Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). *Darlington* establishes that an employer has an absolute right under the National Labor Relations Act to liquidate his entire business for whatever reasons he chooses, even if his motivation is vindictiveness toward a union. *Id.* at 273–74, 85 S.Ct. at 1001. A partial closing motivated by anti-union purposes is also not an unfair labor practice unless a runaway shop is involved or the employer uses the closing to chill unionism in his other businesses. *Id.* at 272–73, 275–76, 85 S.Ct. at 1000–1001, 1002. Both exceptions were found to be present in this case. We are convinced, however, from our review that there is not substantial evidence in the record to support such findings.

---

**3.** Section 8(a)(3) provides in pertinent part:
   It shall be an unfair labor practice for an employer
   . . . .
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discour-

age membership in any labor organization . . . .
29 U.S.C. § 158(a)(3). In order to find a § 8(a)(1) violation in a plant closing, the closing must also violate § 8(a)(3). *Textile Workers v. Darlington Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 998, 13 L.Ed.2d 827 (1965).

█ A runaway shop exists when an employer, in retaliation against union activities, transfers work from the closed facility to another plant or opens a new plant to replace the closed plant. *Id.* at 272–73, 85 S.Ct. at 1000–1001. If no transfer of work has taken place or if there is a transfer of work, but the decision to transfer is made for business reasons unrelated to union activity at the closed plant, then there has been no unfair labor practice. *See Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 67–68 (3d Cir. 1978).

█ The Board adopted with modifications the Administrative Law Judge's finding that Weather Tamer transferred work from its Tuskegee plant to its Lewisburg plant in retaliation against the Tuskegee employees' election of the Union. The Board found that the § 8(a)(1) statements, the timing of the layoffs, and "other facts" established a *prima facie* case of a § 8(a)(3) violation, and that Weather Tamer had failed to demonstrate that the termination of Tuskegee Garment would have taken place even in the absence of Union activity.[4]

█ In reaching this conclusion the Board overlooked the myriad of evidence presented by Weather Tamer which demonstrated that the decision to close was for business reasons. The record as a whole clearly reflects, by overwhelming evidence, that the decision to close Tuskegee was in reaction to economic conditions and not in reaction to the Union. Our reading of the record indicates that rather than a transfer of work, what occurred was a business consolidation resulting from a declining demand for Weather Tamer's goods.

Uncontroverted evidence establishes that orders for Weather Tamer's garments began to drop during the spring, 1978, season. At the end of that season company records reflect a substantial decline in sales, and this decline continued through the fall, 1978, season.[5] The layoffs at Tuskegee coincided with this declining demand. The record also discloses that although approximately 100 Tuskegee employees were discharged, employment at the Lewisburg plant did not increase throughout 1978, and the total Weather Tamer payroll decreased by approximately 200 employees from mid-July, 1978, to mid-December, 1978.

It is clear from the record that Weather Tamer did not increase production capacity at Lewisburg or its other plants to compensate for the shutdown of Tuskegee. The only reasonable conclusion to be drawn from the evidence is that, faced with a deteriorating economic climate, Weather Tamer made a business decision to consolidate its holdings. *See Frito-Lay,* 585 F.2d at 67; *NLRB v. Lloyd Wood Coal Co., Inc.,* 585 F.2d 752, 756–57 (5th Cir. 1978). The fact that Weather Tamer chose to close Tuskegee rather than its newly constructed Lewisburg facility is none of our concern. This decision was for management, not for the Board or this Court, to make.[6]

█ The Board and the Administrative Law Judge inferred from the timing of

---

4. *See Wright Line,* 251 N.L.R.B. 150 (1980). *Wright Line* shifts the burden to the employer to demonstrate an absence of illegal motivation once the General Counsel establishes a *prima facie* case. Whether the analysis used by the Board is appropriate under our case law is unclear. *Compare NLRB v. Robin American Corp.,* 654 F.2d 1022, 1025 (5th Cir. 1981), *modified in part,* 667 F.2d 1170 (5th Cir. 1982) *with TRW, Inc. v. NLRB,* 654 F.2d 307, 312 (5th Cir. 1981). We find it unnecessary to resolve this question since this record is totally devoid of support for the § 8(a)(3) findings. Regardless of who has the burden of going forward with evidence, the General Counsel must prove by substantial evidence in the record as a whole that union animus actuated the plant closing. This the General Counsel failed to do.

5. The spring season ran from approximately August to February and the fall season ran from approximately February to August.

6. Although management decisions unmotivated by union animus need not be reasonable and may even be harsh, *see, e.g., Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1259–60 (5th Cir. 1978) and cases cited therein, we note that this decision appears perfectly reasonable. Tuskegee's location compared to the location of the other Weather Tamer plants was undesirable and a newly constructed facility was ready to house the Lewisburg plant which had previously operated out of a leased building. *See* note 2 *supra.*

the layoffs and the § 8(a)(1) statements that the closing of Tuskegee was directly related to the organizational efforts of the Union.[7] However, unlawful motivation is not lightly to be inferred and "mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence." *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1259 (5th Cir. 1978). *See also Delco-Remy*, 596 F.2d at 1305; *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 744 (5th Cir. 1979). A finding of unlawful motivation cannot be based solely on the anti-union stance of an employer, *e.g., Florida Steel Corp.*, 587 F.2d at 744, and the fact that the layoffs coincided with union activity does not establish anti-union motivation where, as here, the record as a whole demonstrates that the closing was for valid economic reasons. "Given the economic necessity which existed in the case *sub judice*, it was management's function to decide at what point the slowdown became sufficiently protracted to require a decrease in personnel." *NLRB v. Materials Transportation Co.*, 412 F.2d 1074, 1077–78 (5th Cir. 1969).

■■■ We next turn to the finding that Weather Tamer sought to use the Tuskegee closing to chill unionism at its Athens plant. This finding is based on a letter by Heller which was sent to the Athens employees on August 29, 1978, and on a single conversation between an Athens supervisor and employee. The letter and conversation were also found to be threatening in violation of § 8(a)(1).

We have read the letter and find it to be totally innocuous. In it Heller merely advises the Athens employees of the scheduled election at the Tuskegee plant, states that he is opposed to the Union, and asks the Athens employees to consider the pros and cons of union representation before signing authorization cards. This letter was a proper communication between employer and employee; it did not violate § 8(a)(1).

In contrast, the conversation was clearly threatening. Edith Tucker, an Athens employee, testified that about the first of September, Supervisor White told her that Heller had closed the Tuskegee plant because its employees had voted for the Union and that if the Athens employees supported the Union, the Athens plant would also be closed. We agree with the finding of the Administrative Law Judge that this conversation violated § 8(a)(1).[8]

■■■ Although the conversation is a violation of § 8(a)(1), we do not believe that either the conversation or the letter is sufficient to establish a motive to chill unionism in violation of § 8(a)(3). *Darlington* establishes that "a partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect." 263 U.S. at 275. The employer action must be accompanied by a specific motive to chill unionism at other plants, "employer action which has a foreseeable consequence of discouraging concerted activities generally does not amount to a violation of § 8(a)(3) in the absence of a showing of motivation which is aimed at achieving the prohibited effect." *Id.* at 276 (footnote omitted).

■■ The Administrative Law Judge characterized the letter and the conversation as "well orchestrated efforts of Respondent to intimidate its Athens plant em-

7. In addition, the Administrative Law Judge cited the failure of management to inform the employees of the decision to close, management's efforts to defeat the Union, and the absence of evidence reflecting discontent with the Tuskegee operation.

8. We cannot agree with Weather Tamer that the Administrative Law Judge erred in crediting the testimony of this witness. We note that one other witness, Alvin House, testified that similar statements were made to him by Supervisor White. House's testimony was inconsistent in several respects with Tucker's testimony. The Administrative Law Judge did not cite the incident related by House as a violation of § 8(a)(1) or as an instance of activity aimed at chilling unionism. The Administrative Law Judge apparently chose to credit Tucker's testimony and to discredit House's testimony. We respect this credibility choice; it was not inherently unreasonable. *See Delco-Remy*, 596 F.2d at 1304.

ployees from seeking representation." We cannot agree that the evidence in this case supports such a conclusion. "Substantial evidence is more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Nothing in the record indicates that Weather Tamer conducted a systematic campaign to chill unionism at its other plants. Rather, the record clearly establishes that Tuskegee was closed for economic reasons. Although a valid economic decision to close a plant may amount to a § 8(a)(3) violation if the employer uses the plant shutdown to inhibit union activity at other plants, see *Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 986 (3d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), we are simply not willing to hold on this record that such an intent has been demonstrated. The conversation was a violation of § 8(a)(1) but, without more support than this record presents, we hold that the conversation and the letter are insufficient to establish a motivation to chill which the Supreme Court has held crucial to a § 8(a)(3) violation.[9]

*The Duty to Bargain—Section 8(a)(5)*

The critical question presented by the § 8(a)(5) findings, whether Weather Tamer had a duty to bargain with the Union regarding the decision to close Tuskegee, has been resolved by the Supreme Court. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), holds that an economic decision to close part of a business is not a mandatory subject of bargaining under § 8(d) and § 8(a)(5).[10]

We conclude that the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision and we hold that the decision itself is *not* part of § 8(d)'s "terms and conditions," . . . over which Congress has mandated bargaining.

*Id.* at 686, 101 S.Ct. at 2584 (footnotes omitted).

The Supreme Court noted that "the union's legitimate interest in fair dealings is protected by §. 8(a)(3), which prohibits partial closings motivated by anti-union animus." *Id.* at 682, 101 S.Ct. at 2582. Our holding that Tuskegee was closed for legitimate economic reasons and not in violation of § 8(a)(3) leads to the corollary conclusion that the failure to bargain over the closing was not a violation of § 8(a)(5).

*Conclusion*

Since this Court finds substantial evidence in the record as a whole to support the § 8(a)(1) findings, the provisions of the Board's order which relate to the § 8(a)(1) violations (excepting the August 29th letter to the Athens employees) will be enforced. However, the § 8(a)(3) and § 8(a)(5) findings are not supported by substantial evidence and the portion of the Board's order which pertains to those findings, including the provisions requiring the reopening of Tuskegee Garment Corporation and the reinstatement and award of back pay to the discharged employees, will not be enforced.

ENFORCED IN PART: DENIED IN PART.

---

**9.** *Cf. NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 311 (5th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979) ("scattered anti-union remarks . . . might appear to be independent conclusions of the supervisors"); *Federal-Mogul*, 566 F.2d at 1257 (isolated and innocuous statements were not threats).

**10.** Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively." 29 U.S.C. § 158(a)(5). Section 8(d) provides that the duty to bargain encompasses "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).