**PUROLATOR ARMORED, INC., Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.**

No. 84–5222.

United States Court of Appeals, Eleventh Circuit.

July 9, 1985.

Allen B. Roberts, Roberts & Finger, Thomas C. Greble, New York City, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., John F. Welsh, Washington, D.C., Local 299, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Detroit, Mich., for respondent.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The National Labor Relations Board (Board) determined that Purolator Armored, Inc. (Purolator) violated section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (3), by threatening and intimidating coin room employees prior to a representation election and by closing its coin room imme-

diately following a union victory in that election. The Board ordered, *inter alia*, back pay and reinstatement for former coin room employees. Purolator petitions for review of the Board's section 8(a)(3) determination and the remedy ordered by the Board. The Board has filed a cross-application for enforcement of its order. We hold that the record supports the Board's finding of a section 8(a)(3) violation, and that we lack jurisdiction to consider the propriety of the remedy. Accordingly, we grant full enforcement of the Board's order.

## I. BACKGROUND

The Administrative Law Judge (ALJ) made the following findings which were subsequently adopted by the Board:

Purolator provides armored car and related services to customers requiring the transportation and safeguarding of funds and valuables. This case involves Purolator's terminal in Detroit, Michigan. At all relevant times, Local 299, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union), has been the recognized collecting bargaining representative of the drivers, messengers, and mechanics at the Detroit terminal. For an undisclosed period of time, the Detroit terminal has provided its customers with a change service. In April 1979, Purolator began providing this service through a coin room at the terminal. Coin room employees prepared change bags and gave them to the drivers. The change service was not intended to generate profits, but rather, to provide a customer service. Ever since its inception, management has been aware that the change service was unprofitable.[1]

In March 1980, the Union began an organizational campaign among coin room employees. Union business agent, George Langkil, asked Union Steward Don Smith to canvas the coin room employees about Union membership. Smith spoke with coin room employee Mark Longas who, in turn, discussed unionization with many of the coin room employees and gave them authorization cards to sign. On April 29, the Union filed a petition for a certification election with the Board. The election was set for May 29, 1980.

Management discussed unionization with coin room employees on numerous occasions prior to the election. In the context of a conversation concerning a promotion, coin room employee Catherine Donovan was asked whether she would talk with other employees about the Union. Longas was pulled aside by management and asked if he knew anything about the Union or who was involved with it. On the day before the election, management officials held a meeting for the coin room employees. At the meeting, Divisional Vice-President Russell Dyer told the employees that if the Union was voted in, the Company would be required to reevaluate the coin room situation. He said that he thought such a reassessment would be followed by a cost increase to customers, which would cause a loss of customers, and would result in employees losing their jobs. Dyer also told employees that a union was not necessary, that Purolator was currently considering increased benefits for employees, and that those who planned to vote "yes" the next day could stay at home, but that those who planned to vote "no" could report to work. On election day, employee Donovan was asked by management how the other employees would vote.

The Union won the election thirteen to one. After the results were announced, Longas was told by management that he couldn't believe that Longas had done "it" and that Longas had the most to lose.

---

1. Soon after the coin room's establishment, Assistant Operations Manager Al Young stated in a memo that the coin room was losing money. In March, 1980, Thomas Loyal, Divisional Vice-President of the Southeast Division, conducted an inspection of the operation because Purolator was considering installing a coin room in another jurisdiction. Loyal concluded that the coin operation was a "serious loser financially." On April 23 and 24, 1980, Dennis Cichalski, Purolator's Assistant Comptroller, visited the Detroit terminal to examine the coin room. He determined that a cost-benefit study of the coin room was warranted. This study revealed that the coin room experienced a monthly net loss of $19,286.

On June 5, 1980, one week after the election, Dyer wrote a letter to Union Business Agent Langkil in which he stated that, due to economic considerations, Purolator had decided to discontinue the change service. The letter further stated that on June 20, 1984, Purolator would lay off twelve coin room employees indefinitely. In a letter dated June 6, Langkil replied:

In response to your letter of June 6, 1980 it is my understanding that because of the Bargaining Unit that was included in your operation of … Detroit, Michigan, you are putting into effect a layoff as of June 20, 1980.

Therefore, I am requesting you to use all union members that were organized into your operation before calling any outside part-time help.

Also on June 6, Operations Manager Al Young held a meeting with the coin room employees. Union Steward Smith and Business Agent Langkil were invited to the meeting; however, neither attended. At the meeting, Young told the employees that the coin room would be shut down effective June 20. Young said that Purolator would offer part-time employment to coin room employees according to their seniority, that qualified employees would be offered positions on Purolator's trucks, and that there would be a need for the continuation of the services of two employees on a part-time basis in the change operation. Young denied that the Union election had anything to do with the coin room closing. Several employees suggested various alternatives to make the coin room profitable, but Young would not discuss them.

In an undated letter addressed "Dear Customer," Purolator advised its customers of the coin room closing.[2] The letter, signed by Dyer, stated:

After careful analysis, we discovered that our change service operation cost significantly more than we can afford. This is caused by today's high cost of money, complicated by a recent vote of our coin room employees to become Teamster members.

This letter was distributed to several coin room employees. In addition, various employees were told that it was their own fault that the service was terminated, that it was closed because they had voted for the Union, and that the company was planning to open a non-union coin room in Flint, Michigan. Several employees were questioned about who had initiated the Union campaign.

There was no contact between the Union and Purolator between Langkil's June 6 letter to Dyer and June 17. On June 17, the Union filed the charge in the present case. Three days later, Dyer wrote Langkil a letter containing the names and layoff dates proposed for each of the fourteen coin room employees. Nine change service employees were laid off June 20, two were laid off June 27, and two were laid off on July 5.[3] To date, none of the laid off employees has been reinstated. Management officials made several unsuccessful attempts to meet with the Union's business agent to negotiate a coin room contract for those eligible persons remaining on the job. Several meetings eventually took place, during which James Morisette, the Union's new Business Agent, requested reinstatement and back pay for the laid off coin room employees. Thereafter, negotiations between Purolator and the Union for a renewal of the collecting bargaining agreement covering the other Detroit terminal employees culminated in a new contract on October 2, 1980. The agreement incorporated the coin room employees into the recognition clause and provided for customary terms and conditions of employment, including wages, for coin room personnel.

The Union's complaint alleged, *inter alia*, that Purolator: violated section 8(a)(1) by interfering with, restraining, and coercing certain of its employees; violated section 8(a)(3) by terminating its change ser-

---

**2.** Customers were not consulted prior to the decision to close the coin room.

**3.** Purolator claims that thirteen of the employees were offered part-time employment to per-

form the remaining coin room functions and that each qualified employee was offered a position as a part-time driver.

vice operation and laying off the change service employees; and violated section 8(a)(5) by refusing to bargain collectively concerning the change service termination and employee layoffs. The ALJ determined that Purolator had violated all three sections, and that Purolator must reopen the coin room and provide reinstatement and back pay to the fourteen employees who were laid off. Purolator filed exceptions with the Board. The Board directed a remand to the ALJ for further findings with respect to the applicability of *Textile Workers Union v. Darlington Manufacturing Company*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). The ALJ issued a supplemental decision, concluding that *Darlington* was applicable and reaffirming in all material aspects the original decision and recommended remedy. Purolator again filed exceptions with the Board. The Board subsequently adopted the ALJ's section 8(a)(1) and (3) findings and conclusions, but determined that Purolator had not violated section 8(a)(5). The Board also modified the ALJ's proposed remedy, removing the requirement that Purolator reopen the change room. Instead, the Board ordered Purolator to "make whole all employees employed in the coin change service who were terminated as a result of the Respondent's discriminatory decision to close that operation." Purolator was or-

dered to offer reinstatement to each of the discriminatees by either (1) reinstituting the coin change service operation and offering each discriminatee reinstatement to his or her former position or a substantially equivalent position; or (2) offering each discriminatee any position in its existing operations which he or she is capable of filling. In the event there were insufficient jobs available to permit immediate reinstatement, the discriminatees who were not placed were to be put on a preferential hiring list for future vacancies. In addition, Purolator was required to make the discriminatees whole by paying each of them the amount he or she would have earned from the date of termination to the date the discriminatee either secures equivalent employment or Purolator makes an offer of reinstatement.[4]

## II. SECTION 8(a)(1) VIOLATIONS

The Board upheld the ALJ's determinations that Purolator had violated section 8(a)(1) by interrogating employees about their union activities; by threatening employees with reprisals, including termination, for engaging in union activity; by promising benefits to induce employees to refrain from union activities; and by making statements suggesting to employees that their union activity was under surveillance.[5] Purolator does not appeal the

---

**4.** The Board also ordered Purolator to cease and desist from all conduct in violation of section 8(a)(1) of the Act, from discriminating against employees because they engage in union activities, and from in any other manner interfering with employees in the exercise of rights guaranteed them by section 7 of the Act. In addition, Purolator was ordered to mail and post remedial notices.

**5.** Specifically, the ALJ's decision, affirmed by the Board, found fourteen separate examples of unlawful conduct:
1. Vacca unlawfully interrogated Longas in early May.
2. On May 8, Vacca asked Donovan to dissuade other employees from Union activities.
3. On May 15, Larson unlawfully interrogated Longas.
4. On May 28, Dyer threatened to close the coin room.
5. Dyer impliedly promised to correct employee grievances.
6. On May 29, Larson interrogated Donovan.

7. On May 29, Larson implied surveillance of union activities and possible retaliation against employees.
8. In early June, Dyer attributed the closing to the advent of the Union in his "Dear Customer" letter.
9. On June 17, Vacca told Donovan she probably still would have her job but for the Union.
10. On June 17, Vacca unlawfully interrogated Donovan.
11. On June 20, Larson told Elias and Longas the coin room was closing due to the Union.
12. In mid-June, Larson indicated a predisposition to remain non-union by referring to the possibility of opening a coin room in Flint.
13. On June 20, Delpier told Bradley the coin room was closing because of the Union.
14. On June 13, Vacca told Elias the closing was due to the Union and "right now 'you' (referring to Elias or other employees) are too much trouble."

Board's findings of section 8(a)(1) violations;[6] we therefore summarily affirm the Board's conclusions.

## III. SECTION 8(a)(3) VIOLATION

The Board found that Purolator violated section 8(a)(3) by closing its change service.[7] Under section 8(a)(3), it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). The Supreme Court in *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), determined that a partial closing violates section 8(a)(3) "if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect." *Id.* at 275, 85 S.Ct. at 1002.[8] Here, the Board found that Purolator's actions in terminating the change service fulfilled both prongs of this test. We agree.

We begin by noting that we are bound by the Board's factual determinations if they are supported by substantial evidence in the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Weather Tamer, Inc. v. NLRB*, 676 F.2d 488, 487 (11th Cir.1982). "If the Board has made a 'plausible inference from the evidence' we may not overturn its findings, although if deciding the case *de novo* we might have made contrary findings." *Weather Tamer*, 676 F.2d at 487 (quoting *Sturgis Newport Business Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir.1977)).[9] In addition, "[v]iolation *vel non* of [section 8(a)(3)] depends on the employer's motive for terminating employment; the task of determining motive is 'particularly within the purview of the Board.'" *NLRB v. Fort Vancouver Plywood*, 604 F.2d 596, 600 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980) (quoting *NLRB v. Vangas, Inc.*, 517 F.2d 747, 748 (9th Cir.1975)). "In determining

---

The ALJ also found three other actions supported its finding of anti-union motivation:
1. Dyer's suggestion, on May 28, that those who would vote for the Union could stay home and those who would vote against the Union could come to work on election day.
2. On June 20, when Donovan was receiving her final paycheck, Larson told her there would be no negotiations for a closed room....
3. Dyer implied the employer would grant benefits to the coin room employees in order to dissuade them from voting for the Union....

6. Purolator notes that it believes the Board's conclusion that it violated section 8(a)(1) is erroneous, but because of "the unwillingness of the Courts of Appeals to reverse administrative findings based on credibility resolutions by the trier of facts," Purolator decided to "focus" on the section 8(a)(3) determination.

7. The ALJ and Board referred to the closing as both a section 8(a)(1) and a section 8(a)(3) violation. However, in *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 268–69, 85 S.Ct. 994, 998, 13 L.Ed.2d 827 (1965), the Supreme Court determined that a closing or partial closing is correctly dealt with under section 8(a)(3) and, therefore, we analyze the closure pursuant to that section. *See Weather Tamer, Inc. v. NLRB*, 676 F.2d 483,

490 (11th Cir.1982) ("In order to find a § 8(a)(1) violation in a plant closing, the closing must also violate § 8(a)(3).") (citing *Darlington*, 380 U.S. at 269, 85 S.Ct. at 998).

8. It is not, however, an unfair labor practice "when an employer closes his entire business, even if the liquidation is motivated by vindictiveness towards the Union...." *Darlington*, 380 U.S. at 273–74, 85 S.Ct. at 1001. The Court explained the distinction between a full and partial closing as follows:
   The closing of an entire business, even though discriminatory, ends the employer-employee relationship; the force of such a closing is entirely spent as to that business when termination of the enterprise takes place. On the other hand, a discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of § 7 rights among remaining employees of much the same kind as that found to exist in the "runaway shop" and "temporary closing" cases. *Id.* at 274–75, 85 S.Ct. at 1001.

9. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

motive, the Board may consider circumstantial and direct evidence, and it's inferences will prevail if reasonable and supported by substantial evidence on the record as a whole." *Fort Vancouver,* 604 F.2d at 600 (citations omitted). Although "unlawful motivation is not lightly to be inferred and 'mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence,'" *Weather Tamer,* 676 F.2d at 492 (quoting *Federal-Mogul Corporation v. NLRB,* 566 F.2d 1245, 1259 (5th Cir.1978)), the record in the present case establishes much more than "mere suspicion."

█ Purolator has been found guilty of numerous section 8(a)(1) violations. These actions demonstrate that Purolator was staunchly opposed to unionization of its employees and was willing to commit a variety of unlawful acts to defeat the Union. As such, they form the background of our evaluation of the alleged section 8(a)(3) violation. *See NLRB v. Clark Manor Nursing Home Corporation,* 671 F.2d 657, 660 (1st Cir.1982) (failure of employer to challenge some of Board's findings of violations does not cause those violations to "disappear," rather, "[t]hey remain, lending their aroma to the context in which the [challenged] issues are considered."); *NLRB v. Big Three Industrial Gas & Equipment Company,* 579 F.2d 304, 315 (5th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979) (timing of decision, presence of other unfair labor practices, and lack of attempt to solve problems without termination are considered in finding anti-union motivation in violation of section 8(a)(3)). We are well aware that in the present case there must be a showing not only of anti-union animus, but of a motive to chill non-change service employees. Nevertheless, the anti-union animus displayed by Purolator's section 8(a)(1) violations are important indications that Purolator's motive was to harm unionism. *Cf. NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (section 8(a)(3) violation normally turns on whether the discriminatory conduct was motivated by anti-union purpose); *NLRB v. Dan River Mills, Inc.,* 274 F.2d

381, 384 (5th Cir.1960) ("antiunion bias and demonstrated unlawful hostility are proper and highly significant factors for Board evaluation in determining motive" under section 8(a)(3)). We agree with the Board, as stated in *Darlington* on remand, that in determining whether a purpose to chill exists we must rely on the "fair inferences arising from the totality of the evidence, considered in the light of then-existing circumstances." *Darlington Manufacturing Co.,* 165 N.L.R.B. 1074, 1083 (1967). "The requisite motivation to chill may be provided by something less than direct evidence, which is rarely available in cases of this kind. In this branch of the law, as in all others, proof of motive may be supplied by circumstantial evidence which affords a sound basis for drawing inferences." *Id.* Thus, where it is found that a plant or a portion thereof, is closed because of opposition to the union "the incidence of one such directly causative antiunion motive strengthened the probability of a second antiunion purpose—i.e., the 'chilling' of remaining employees in the exercise of their Section 7 rights." *George Lithograph Company,* 204 N.L.R.B. 431 (1973) (citing *Darlington Manufacturing Company,* 165 N.L.R.B. at 1083).

█ Purolator argues that the coin room was closed solely because it was unprofitable. The record, however, belies this conclusion. The coin room was not designed to be profitable, rather, it was a customer service. Purolator knew from the change service's beginning that it was losing money; yet, it continued to operate the service until one week after the election. The change service was ended without consulting customers, and employees' suggestions for increasing the service's profitability were ignored. Moreover, the day before the election, management told employees that Purolator was considering increasing the coin room employees' benefits. Thus, the evidence supports the conclusion that Purolator was willing to lose money on the coin service until the Union won the election. Although the coin service was admittedly unprofitable, "a valid economic decision to close the plant may amount to a

section 8(a)(3) violation if the employer uses the plant shutdown to inhibit union activity at other plants." *Weather Tamer,* 676 F.2d at 493. Thus, the present case is distinguishable from *Weather Tamer, Inc. v. NLRB,* 676 F.2d 483 (11th Cir.1982), where the court found "the record as a whole demonstrates that the closing was for valid economic reasons." *Id.* at 492. Here, the circumstances surrounding the termination of the coin room show that economics were not foremost in Purolator's mind. Rather, as in *Electrical Products Division of Midland-Ross v. NLRB,* 617 F.2d 977 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), another partial closing case, an otherwise valid economic decision became an unfair labor practice in the context of its timing and implementation. *Id.* at 986; *see also Great Chinese American Sewing Co. v. NLRB,* 578 F.2d 251, 255 (9th Cir.1978).

Purolator showed its non-coin room employees that unionism would be treated as harshly as possible. Nor was this message merely demonstrative; rather, Purolator made its anti-union animus known by talking to change service employees and by writing a letter to its customers. Purolator argues that there must be evidence that "Purolator's alleged violations of section 8(a)(1) were directly made known to the non-coin room employees." We disagree. The circumstances at Purolator's Detroit terminal were such that the anti-union message would not be missed. The change service employees worked in the same building as the other Detroit terminal employees and there was evidence of daily interaction between the groups as change orders were prepared by coin room employees and delivered by drivers and messengers. In fact, coin room employee Longas testified that it was while he and Union Steward Smith were unloading a truck to-

gether that Smith first mentioned unionization.[10] The union that the coin room employees elected to represent them was the same union that represented the other employees. In addition, both groups were under the same managerial structure. As the ALJ stated, "it is beyond cavil that the Employer's unlawful messages would have reached the remaining employees." This situation is different from that presented to this court in *Weather Tamer,* in which the union claimed a plant closing would have a chilling effect on a plant three hundred miles away. In *Weather Tamer* there was no daily contact between the employees being terminated and those remaining, rather there was only a single conversation between management and a non-terminated employee in which the closing was linked with anti-union animus.[11] Thus, under the specific circumstances in *Weather Tamer,* the court determined that this contact was "insufficient to establish a motive to chill unionism in violation of § 8(a)(3)." *Id.* at 493. Here, however, the contact was constant as the employees saw both the union activism and the result of union activism before their eyes. The proximity between terminated and non-terminated employees provides both evidence of an intent to chill and evidence that a chilling effect was reasonably foreseeable.

Next, Purolator claims that the lack of testimony by non-coin room employees that they felt chilled defeats the Board's conclusion. *Darlington,* however, does not require evidence that the other employees actually felt chilled, only that the employer acted with the purpose and the foreseeable consequence of chilling other employees. *Darlington Manufacturing Company v. NLRB,* 397 F.2d 760, 772–73 (4th Cir.1968). Indeed, a "chilled" employee is unlikely to want to come forward. As stated in *George Lithograph Company,* 204 N.L.

---

**10.** The fact that coin room employees were a distinct group for the purposes of constituting an appropriate bargaining unit does not prove that the employees did not have daily interaction with non-coin room employees.

**11.** The court found that the conversation constituted a section 8(a)(1) violation. The only other link between the two plants was a letter from a

company official advising employees at one plant of the scheduled election at the plant that was later closed. The letter also stated that the official was opposed to the union and that the employees should consider the "pros and cons" of union representation before signing authorization cards. The court found the letter "totally innocuous." 676 F.2d at 492.

R.B. 431 (1973), a case concerning the closing of a mailing department:

> *Darlington* requires only a finding of the foreseeability of the chilling effect rather than evidence of its actual occurrence. To hold otherwise would involve the Board in what would often be an impractical if not impossible investigation into the subjective state of mind of those employees alleged to have been "chilled" in the exercise of their Section 7 rights.

*Id.* at 431.

Purolator also argues that since the other employees were already represented by the Union, they were not involved in "organizational activities" as required under the foreseeability prong of *Darlington*. 380 U.S. at 276, 85 S.Ct. at 1002. We do not read the Court's reference to "organizational activity" as confined to efforts to initially obtain union representation. Rather, the Court's opinion as a whole is directed toward preventing management from "discouraging the free exercise of § 7 rights among remaining employees." *Id.* at 275, 85 S.Ct. at 1002. Union representation is an ongoing process. Union members may be chilled in numerous ways, from failing to vigorously assert grievances, to voting to terminate union representation. Moreover, in the present situation, a new collective bargaining agreement was to be negotiated soon after the change service was terminated. Unless employees feel free to vigorously support their union when a contract is being negotiated, the existence of union representation is of little value. Thus, we find that there was sufficient organizational activity among the remaining employees at the Detroit terminal. *Cf. George Lithograph Company*, 204 N.L.R.B. at 432.

We conclude that the anti-union animus demonstrated by Purolator's numerous section 8(a)(1) violations, combined with the timing and implementation of the closure, and the proximity between the terminated workers and those who remained, provides sufficient evidence to support the Board's conclusion that Purolator was motivated to terminate the change service by a desire to chill union activity among the remaining employees, and that such a result was foreseeable.

## IV. REMEDY

■ Purolator argues that the Board's remedies of back pay and reinstatement should be denied enforcement because these remedies do not effectuate the policies of the Act, in that they frustrate the function of collective bargaining, and because they are impermissibly punitive. The Board, however, correctly points out that we are without jurisdiction to consider this claim because it was not properly raised before the Board. Section 10(e) of the Act, 29 U.S.C. § 160(e), provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The Board, in turn, is bound by regulations which provide that any exception to the ALJ's decision that is not specifically urged before the Board shall "be deemed to have been waived." 29 C.F.R. § 102.46(b).[12] *See,*

---

12. 29 C.F.R. § 102.46 states in pertinent part: (a) Within twenty days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board ... any party may ... file with the Board ... exceptions to the administrative law judge's decision or to any other part of the record or proceedings ... together with a brief in support of said exceptions.
(b) Each exception (1) shall set forth specifically the questions of procedure, fact, law, or policy to which exceptions are taken; (2) shall identify that part of the administrative law judge's decision to which objection is made;

(3) shall designate by precise citation of page the portions of the record relied upon; and (4) shall state the grounds for the exceptions and shall include the citation of authorities unless set forth in a supporting brief. Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded. (c) Any brief in support of exceptions shall contain no matter not included within the scope of the exceptions....

*e.g., Detroit Edison Company v. NLRB,* 440 U.S. 301, 311 n. 10, 99 S.Ct. 1123, 1129, n. 10, 59 L.Ed.2d 333 (1979).

In the present case, the only exceptions made to the ALJ's supplemental decision that related in any way to the remedy, read as follows:

> 43. The conclusion that [it] is appropriate and not inequitable, burdensome or punitive here that the remedy require a return to the *status quo ante* to fully rectify the alleged discriminatory conduct. (J.S.D. 10:37–43).[13]

> 47. The conclusion that Respondent should be required to resume the operations found herein to have been discontinued in violation of Section 8(a)(3) and (1) of the Act (J.S.D. 11:21–26).

> 48. The Administrative Law Judge's Recommended Order in its entirety. (J.S.D. 11:28–34).[14]

Although Purolator now claims that it mentioned reinstatement and back pay in its Brief in Partial Support of and in Partial Opposition to the Supplementary Decision of the Administrative Law Judge, which it submitted to the Board, it did so only in the context of an argument that resuming the operation, reinstatement, and back pay were erroneous remedies *because* Purolator had not committed a violation under *Darlington.* At no time did Purolator urge that reinstatement or back pay were inappropriate remedies for a violation of section 8(a)(3). Thus, the Board was not given an opportunity to assess this issue.

The present case is analogous to *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). In that case, the employer argued before the Board that because the subcontracting clause in question was unlawful, the union's picketing in support of the clause violated the Act. The Board held that the clause was lawful, and, therefore, the picketing was permissible. *Carpenters Local No. 944 (Woelke & Romero Framing, Inc.),* 239 N.L.R.B. 250 (1978). The Ninth Circuit, sitting en banc, determined that the clause was legal and that picketing may be used to obtain a subcontracting agreement, but not to enforce such an agreement. *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB,* 654 F.2d 1301 (9th Cir.1981). Woelke petitioned for certiorari to the Supreme Court on the issue of the legality of the clause and the question of whether the unions could permissibly picket to obtain a lawful subcontracting clause. The Court granted certiorari and determined that the clause was legal. However, the Court held that the court of appeals did not have jurisdiction to determine whether unions could legally picket to enforce a permissible clause because "[t]he issue was not raised during the proceedings before the Board, either by the General Counsel or by Woelke." Similarly, in the present case, the only argument that Purolator made regarding reinstatement and back pay was that they were inappropriate because there had been no illegal act by Purolator.[15] The

---

(h) No matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding.

13. This exception cites the ALJ's discussion of a resumption of operations.

14. This exception is too broad to fulfill the requirements of either section 10(e) or 29 C.F.R. § 102.46(b). *Marshall Field & Company v. NLRB,* 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943) ("Such a general objection did not apprise the Board that petitioner intended to press the question now presented...."). *Accord NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953).

15. Purolator's exceptions to the ALJ's initial decision are also insufficient. Purolator objected to "The Administrative Law Judge's Recom-

mended Remedy in its entirety" and "The Administrative Law Judge's Recommended Order in its entirety with the exception of the dismissal of paragraph 10(e) of the Complaint." Purolator argues that the accompanying brief urged that, if a remedy were warranted, it should be the same as that in *National Family Opinion, Inc.,* 246 N.L.R.B. 521 (1979) (back pay ordered until mutual agreement was reached, good faith bargaining resulted in a bona fide impasse, the Union failed to commence negotiations within the specified period, or the Union failed to bargain in good faith). This argument, however, was directed toward the inappropriateness of reinstituting the coin room, not the inappropriateness of back pay and reinstatement.

record does not indicate that Purolator challenged the appropriateness of the remedy on a separate ground.

Purolator does not cite any "extraordinary circumstances" calling for an exception to section 10(e). Indeed, back pay and reinstatement are common remedies for unfair labor practices under the Act. In *Darlington,* the Court suggested "a possible remedy open to the Board in ... a case [of a discriminatory partial closing], like the remedies available in the 'runaway shop' and 'temporary closing' cases, is to order reinstatement of the discharged employees in other parts of the business." 380 U.S. at 275, 85 S.Ct. at 1002 (footnote omitted). *See Darlington Manufacturing Company v. NLRB,* 397 F.2d 760, 773 (4th Cir.1968), *cert. denied,* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969). *Cf. Nord v. United States Steel,* 758 F.2d 1462 (11th Cir.1985). As the Supreme Court stated in *NLRB v. Ochoa Fertilizer Corporation,* 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961):

> At least when the Board has not "patently traveled outside the orbit of its authority," *National Labor Relations Board v. Cheney California Lumber Company,* 327 U.S. 385, 388, 66 S.Ct. 553, 544, 90 L.Ed. 739, our cases have uniformly held that in the absence of a showing within the statutory exceptions of "extraordinary circumstances" the failure or neglect of the respondent to urge an objection in the Board's proceedings forecloses judicial consideration of the objection in enforcement proceedings.

*Id.* at 322, 82 S.Ct. at 347 (citations and footnote omitted); *see also Detroit Edison v. NLRB,* 440 U.S. at 311 n. 10, 99 S.Ct. 1129 n. 10, 59 L.Ed.2d 333 (1979).

The *Woelke* Court further held that "[t]he § 10(e) bar applies even though the Board held that the picketing was not banned.... Woelke could have objected to the Board's decision in a petition for reconsideration or rehearing. The failure to do so prevents consideration of the question by the courts." 102 S.Ct. at 2083 (citations omitted). Likewise, Purolator could have moved for reconsideration when the Board ordered reinstatement and back pay despite its determination that there was no section

8(a)(5) violation and that reinstitution of the coin room was inappropriate. 29 C.F.R. § 102.48(d)(1). Purolator failed to do so and is now barred from bringing this claim. *See also International Ladies Garment Workers Union v. Quality Manufacturing Co.,* 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975) (respondent who failed to file petition for reconsideration cannot assert its objection on appeal "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e)).

For the foregoing reasons the order of the National Labor Relations Board is ENFORCED in full.