**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELDECO, INCORPORATED,
Petitioner,

v.                                                    No. 96-2092

NATIONAL LABOR RELATIONS BOARD,
Respondent.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                    No. 96-2259

ELDECO, INCORPORATED,
Respondent.

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-16006, 11-CA-16140, 11-CA-16181)

Argued: April 10, 1997

Decided: December 29, 1997

Before HALL and NIEMEYER, Circuit Judges, and
DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Enforcement granted in part and denied in part by published opinion.
Judge Duffy wrote the majority opinion, in which Judge Niemeyer
joined. Judge Hall wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Kenneth Edwards Young, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Greenville, South Carolina; Cherie W. Blackburn, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina, for Petitioner. Steven B. Goldstein, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret Gaines Neigus, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

**OPINION**

DUFFY, District Judge:

The National Labor Relations Board ("NLRB" or "the Board") found that Eldeco, Inc. ("Eldeco" or "the Company"), committed several violations of the National Labor Relations Act ("the Act") at its facilities in North Charleston, South Carolina and Winston-Salem, North Carolina. Eldeco offers two basic responses to these findings: (1) that the ALJ's credibility determinations were biased in favor of the union; and (2) that the Board's findings on the various violations were not supported by substantial evidence. We agree with the Board that substantial evidence supports some violations, and we reject the Company's claims that the agency proceedings were impermissibly biased. We agree with Eldeco, however, that its decision to implement a drug testing policy did not run afoul of the Act. We also agree with Eldeco that its decision to terminate two employees (Waco Cottingham and Stephen Pope) was not based on discriminatory considerations and that the August 3, 1994 letters sent to applicants constituted valid offers of employment. For these reasons, we enforce the Board's order in part and deny enforcement in part.

I.

Eldeco is alleged to have committed unfair labor practices involving electrical work in the construction of K-Mart retail stores in North

2

and South Carolina. The charge pertaining to the North Charleston job site was filed by International Brotherhood of Electrical Workers, Local 776, AFL--CIO ("Local 776"), and the Winston-Salem charges by International Brotherhood of Electrical Workers, Local 342, AFL--CIO ("Local 342") (jointly referred to as "the Union").

After issuance of an original complaint, a consolidated complaint was issued on October 31, 1994. The amended allegations are that, at the Winston-Salem job site, Eldeco violated Section 8(a)(1) of the Act by: (1) advising its employees that union affiliated employees would not be hired; (2) telling employees that it hired a foreman to keep the job site union-free; (3) interrogating employees regarding the union activities of other employees; (4) threatening its employees with unspecified reprisals for engaging in union activity; (5) telling employees that it would not have any union employees on the job; (6) telling an employee that he was being terminated because of his union activity; (7) discriminatorily prohibiting employees from discussing the Union on the job; (8) creating the impression that it was engaged in surveillance of employees' union activities; (9) promulgating and disparately enforcing its drug testing policy in order to discourage union activities by employees; and (10) threatening to discharge employees supporting the Union by implementing a drug testing policy.

The complaint also alleges that, at the Winston-Salem job site, Eldeco discharged employee Gregory Davis and failed to consider and refused to offer jobs to 16-named applicants because of their union activities or sympathies, in violation of Section 8(a)(3) of the Act.

At the North Charleston job site, the complaint alleges that Eldeco failed to consider and refused to offer jobs to nine applicants because of their union activities, in violation of Section 8(a)(3) of the Act.

A hearing was held before the ALJ in Charleston, South Carolina, on January 18, 19, and 20, 1995. The ALJ issued his opinion on June 9, 1995. He uniformly found in favor of the Union on issues of credibility and held that Eldeco had engaged in several unfair labor practices. The ALJ concluded that the Company violated Section 8(a)(1) of the Act at its Winston-Salem, North Carolina job site by: (1) advis-

3

ing its employees that a foreman had been hired to keep the job site "union-free"; (2) interrogating employees regarding the union activities of other employees; (3) threatening employees with unspecified reprisals for engaging in union activity; (4) telling employees that there would not be any union employees on the job; (5) telling an employee that he was being terminated because of his union activities; (6) creating the impression that Eldeco was engaging in surveillance of its employees' union activities; (7) promulgating and disparately enforcing a drug testing policy in order to discourage union activities of its employees; and (8) telling employees that the purpose of the drug-testing program was to eliminate union employees.

The ALJ further concluded that the Company violated Section 8(a)(1) and(a)(3) of the Act by: (a) discharging employees Gregory Davis on July 23, 1994, and Stephen Pope and Waco Cottingham on August 11, 1994, because of their union activities and sympathies; and (b) failing to consider for employment and failing to employ certain applicants because of their union sympathies and activities.

The Board affirmed the ALJ's conclusions and required that injured employees be reinstated, made whole, and further directed the Company to cease and desist from all unfair labor practices. Eldeco filed this petition for a review of the Board's order, and the Board cross-petitioned for enforcement.

The ALJ's findings of fact are adequate to address most of the Company's arguments. Therefore, we will reiterate the facts only when specifically relevant.

II.

Eldeco lodges various objections to the fact-finding process in this case, which we shall consider seriatim.

A.

Eldeco first presents statistical arguments, which it claims prove that the ALJ was biased in favor of the Union. Eldeco notes that the

4

ALJ credited all of the Union's witnesses and none of its own, thereby proving bias. Contrary to the Company's suggestion, bias is not established merely because an ALJ uniformly credits one party's witnesses over another's. NLRB v. Pittsburgh Steamship Co., 337 U.S. 656, 659 (1949). Furthermore, this court, in Fieldcrest Cannon v. NLRB, previously stated:

> Our review shall not be driven . . . by an overall statistical balance of whose witnesses received credit and whose did not. To do so would amount to judging a case by some mechanical formula rather than the merits of the evidence. After all, such statistics do not inform us whether"a credibility determination is unreasonable, contradicts other findings of fact, or is `based on an inadequate reason or no reason at all.'"

97 F.3d 65, 69 (4th Cir. 1996) (citing NLRB v. McCullough Environmental Services, Inc., 5 F.3d 923, 928 (5th Cir. 1993) (citation omitted)).

Eldeco also contends that approximately 89% of the ALJ's decisions in the last 20 years were in favor of the Union, thereby indicating a bias in favor of labor unions. Fieldcrest also held that this type of statistical argument is irrelevant. Fieldcrest, 97 F.3d at 69 ("To evaluate an ALJ's impartiality in this way amounts to judging his record by mere result or reputation, and in reality, such statistics tell us little or nothing."). Accordingly, we have set aside the statistics and have examined the fact-finding in this case to assess whether the record as a whole supports the ALJ's determinations.

B.

Eldeco next challenges many of the ALJ's credibility determinations. However, the credibility determinations that Eldeco challenges were the product of lengthy and thorough proceedings during which each party had ample opportunity to present its respective position to the ALJ. The testimony consumed 3 days, during which the Union called 31 witnesses, and Eldeco called 6 witnesses. The transcript filled more than 800 pages.

5

The ALJ's decision reflects careful consideration of the testimony, and he specifically stated that his decision was based upon his observation of the demeanor of the witnesses. Furthermore, the ALJ carefully spelled out each violation, the evidence proving the violation, and his reasons for ruling as he did. Reviewing courts owe deference to factual findings, assessing them only to determine whether they are supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent "exceptional circumstances." NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir. 1983). Exceptional circumstances include cases where "a credibility determination is unreasonable, contradicts other findings of fact, or is`based on an inadequate reason or no reason at all.'" McCullough, 5 F.3d at 928 (citation omitted). Only in such a situation is a reviewing court "free to review the record and independently reach [its] own conclusions." McCullough, 5 F.3d at 928. Otherwise, careful fact-finding, such as that undertaken in this case, is entitled to deference.

III.

Giving the proper deference to the ALJ's fact finding determinations leaves no doubt that Eldeco committed certain unfair labor practices. However, the pervasiveness of those violations is not as great as the ALJ concludes. A careful review of the record reveals that most of the ALJ's credibility determinations are supported by substantial evidence; however, we find that some of the ALJ's findings are not. Eldeco's drug testing policy was not disparately enforced in order to discourage union activities of its employees. We further disagree with some of the inferences and conclusions drawn from the findings as well as the scope of the remedy.

A.

Eldeco's drug testing policy at the Winston-Salem job site was instituted on or about August 1, 1994, at the direction of Morris Mason, Eldeco's director of safety. During the last week of July 1994, Mr. Mason performed a safety inspection at the job site and received indications that employees of other contractors were using drugs. Based on this information and because Eldeco was preparing to hire

6

a very large group of new employees, Mr. Mason directed Mr. Mastalz to immediately make arrangements to drug test all new applicants. Eldeco assessed that it did not have an existing drug problem, and therefore opted not to incur the additional expense of testing its current employees.

The ALJ found that this rule was promulgated in response to a union organizing drive and disparately enforced in violation of Section 8(a)(1) of the Act. NLRB v. McCullough Env. Services, 5 F.3d 923 (5th Cir. 1993); NLRB v. S.E. Nichols, Inc. , 862 F.2d 952 (2d Cir. 1988). Some of the factors that are relevant to determine whether an employer has promulgated rules in response to employee Section 7 activity are: the timing of the rules' promulgation, whether the announcement of the rules was accompanied by remarks about union organizing, the employer's hostility to the union drive, and whether the employer's justifications withstand scrutiny. Cannondale Corp., 310 NLRB 845, 849 (1993); Capitol EMI Music, Inc., 311 NLRB 997, 1006 (1993), enforced, 23 F.3d 399 (4th Cir. 1994). The Board noted that the timing of the implementation was just one week after a strike and the Union's filing an unfair labor practices charge. Furthermore, the ALJ credited Mr. Heath's testimony that Mr. Mastalz said that the purpose of the drug test policy was to get rid of "union guys," not drug users. This statement is seemingly buttressed by the evidence that one employee (Mr. Luper) who failed the drug test was allowed to continue work for two months. Accordingly, the Board's inference that the drug test policy was promulgated in response to union activity may facially appear to be supported by substantial evidence.

On the other hand, there is absolutely no evidence of disparate enforcement of the policy. As the board also noted, we fully recognize that a nondiscriminatory drug testing policy serves a legitimate employer interest by addressing the problem of drug abuse in the work force. There is evidence that every applicant, union and non-union, who applied after August 1, 1994, was required to take a drug test. Furthermore, out of the more than 20 drug test reports in the record, six indicate drug use, thereby adding credence to the Company's concerns. As to Mr. Luper, it must be noted that he challenged the accuracy of his first test, and his second test was negative.

7

We therefore refuse to punish a company for implementing a drug testing program which is a good safety device and a valid public policy decision when there is no evidence of discriminatory enforcement. The argument that the Company must test all present employees in order to test all new applicants is specious. Accordingly, we deny any recovery related to the drug testing policy.

B.

The Board's determination that Eldeco's discharge of Stephen Pope and Waco Cottingham was motivated by anti-Union animus is not supported by substantial evidence. Mr. Pope, a Union member who was hired through a temporary service, went to the Winston-Salem job site on August 8, 1994, wearing a Union T-shirt. He told Mr. Mastalz that he was Union, and though aware of the strike, wanted to work anyway. He worked for two days and was then told that the fees paid to the temporary agency were too high. Mastalz told him that the Company would hire him directly, but that he would have to take a drug test.[1] Pope refused to take the test and was discharged.

Waco Cottingham was not a Union member. He was hired directly by the Company on August 9, 1994, when he applied at the job site. Mr. Cottingham signed the standard form acknowledging that the Company had a substance abuse policy that may require him to take a drug test in the future. He was later seen having lunch with Pope, a known Union supporter, on August 10, 1994. The next day, his second day of work, Cottingham was told that he had to take a drug test. He refused and was terminated.

Both employees began work after the drug policy was implemented. Again we note that there is no evidence that any new employee or applicant at the Winston-Salem job site was not drug tested. Since the drug testing policy was not disparately enforced, and we have upheld that policy as valid, we must then reverse the Board's

_____

[1] Mr. Mason instructed Mastalz that employees from the temporary service need not be tested; only those employees that applied directly to the Company.

8

determination that Eldeco's discharge of Stephen Pope and Waco Cottingham was in violation of the Act.

C.

We also reverse the Board's determination that the August 3, 1994 letters to the applicants do not constitute valid offers of employment. After the strike at the Winston-Salem job site, Eldeco was in need of several employees. It therefore sent out form letters to many applicants reading:

> Eldeco, Inc. has work available for you at the K-mart location in Winston-Salem. If you are interested, please contact Norman Mastalz at the job site to arrange for a drug test and to work out details of wages and hours.

On August 9, 1994, Mr. Maurice, the Union's Business Manager, faxed a letter to Mr. Mason stating that many of the Union members who had applied with Eldeco had received the correspondence regarding possible employment. Maurice also referenced the drug test and warned that "an additional condition for employment required of only the known Union applicants is a blatant violation of employees' Section 7 rights." Mason replied to the letter and informed Maurice of the safety reasons behind the drug test policy. None of the Union applicants replied to the offer of employment.

For the reasons discussed above, we uphold the drug testing policy as valid, and therefore the letters of August 3, 1994, constituted valid offers of employment.[2]

_____

[2] This determination does not, however, affect any findings of the ALJ that Eldeco violated the Act by failing to consider for employment and by failing to employ the Union applicants at the Winston-Salem job site prior to August 3, 1994. We do hereby limit any remedy, including back pay, for the aforementioned violations to the time an applicant was offered a job and did not accept it. Any appropriate remedial determinations, such as when back pay obligations began to accrue, or may have terminated, shall be considered in the compliance process. Casey Electric, 313 NLRB 774 (1994).

IV.

Eldeco next contends that some of the applicants were not bonafide employees under the Act because they were under the direction of the Union. Eldeco makes the argument that if one is paid by the Union and/or owes his allegiance to the Union, then the Union, rather than the employer, would control the actions of the employee; and thus, he could not be an employee under the act.

The Board adopted the ALJ's findings that Mr. Maurice, the paid business manager of Local 342, and other union members who admittedly owed loyalty to the Union were bona fide applicants for employment and "employees" within the meaning of the Act. Subsequent to the ALJ's decision, the Supreme Court issued its opinion in NLRB v. Town & Country Elec., Inc., in which the Court accepted the contention that paid Union organizers are employees within the meaning of Section 2(3) of the Act:

> The Board . . . concluded that service to the Union for pay does not "involve abandonment of . . . service" to the company. And, that conclusion seems correct. Common sense suggests that as a worker goes about his ordinary tasks during a working day, say, wiring sockets or laying cable, he or she is subject to the control of the company employer, whether or not the Union also pays the worker. The company, the worker, the Union, all would expect that to be so. And, that being so, that Union and company interests or control might sometimes differ should make no difference.

116 S. Ct. 450, 456 (1995) (internal citations omitted).

In the present case, there is no evidence of any arrangement between the Union and the applicants which would have caused the Company to lose control over normal workplace tasks in the event it had hired them. Accordingly, we agree with the ALJ that Mr. Maurice and the others were employees entitled to protection under the Act.

V.

We next turn to the North Charleston job site and alter slightly the remedy ordered by the Board.

10

On March 1, 1994, Tom Flood, Sr., a member of Local 776, and seven other individuals affiliated with Local 776-- Tom Flood, Jr., James Anderson, Sean Taylor, Vernon Taylor, David Smith, Doug Michi, and James Michi -- appeared together at the Company's North Charleston office and applied for work as electricians (with the exception of Tom Flood, Jr., who was seeking an apprentice position). Tom Flood, Sr., introduced the group to the Company's representatives as Union members. Chris Momeir, the Company's director of operations, said that the Company would need 10-12 employees initially and that the Company also had work in Winston-Salem, North Carolina, and Hartsville, South Carolina. Momeir told the group to come back on Friday, March 4, for interviews with General Superintendent Edward Ball. John Frazier also went by the office on March 1, 1994. He left his application and was told by the secretary that the Company was planning to hire about 10 men in two weeks.

The group, minus James Michi, returned on March 4, 1994, and was informed that Mr. Ball had just left. Superintendent George Kelly told the group to leave their applications, that the Company would be hiring about 20 men and they would be contacted.

Subsequently, between March 1, 1994 and May 1, 1994, several of the applicants went by the Company's office or the North Charleston job site to check about employment opportunities. None of them were hired. On May 2, 1994, Samuel Grimsley applied for work and was immediately hired. He was not a member of the Union and had no prior work history with Eldeco.

The Union filed unfair labor charges against Eldeco in North Charleston on May 6, 1994. Thereafter, in June 1994, the Company offered employment to several of the applicants listed in the complaint.

An employer violates Section 8(a)(1) and (a)(3) of the Act by refusing to consider applications or to hire applicants because of their Union sentiments, membership or activities. Here, the ALJ concluded, and the Board agreed, that by failing to consider the applications of the Union supporters at the North Charleston Office and by failing to hire them, the Company engaged in unfair labor practices under Section 8(a)(1) and (a)(3). Applying our deferential standard of review,

11

we uphold the ALJ's findings of fact, which are clearly supported by substantial evidence in the record. However, we disagree as to the extent of the violations and therefore limit the remedies accordingly.

A.

On April 8, 1994, Tom Flood, Sr., gave a sworn statement in support of charges made against Eldeco in a law suit pertaining to defective work at an unrelated project. The statement listed several code violations allegedly committed by Eldeco and stated that Mr. Flood "feared for [his] life and could not sleep thinking of the danger to the public."

On April 15, 1994, Tom Flood, Sr., went to Eldeco's offices to check on his application. While there, he spoke with Richard Zeron, manager of Eldeco's North Charleston branch, who questioned him about his criticisms of the unrelated project. Mr. Flood stated that Zeron was upset about the allegations. Zeron testified that he did not want to rehire Tom Flood, Sr., because he did not think it advisable to hire someone who was adverse to Eldeco at the start. We find that Eldeco had a valid non-discriminatory reason for not hiring Mr. Flood, Sr. Goldtex, 14 F.3d at 1011; see also NLRB v. Wright Line, a division of Wright Line, Inc., 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982).

However, Eldeco could not have known about Mr. Flood's statement prior to April 8, 1994. Also, Mr. Flood should have been high on Eldeco's hiring list because he had worked for Eldeco previously.[3]

_____

[3] Eldeco had written guidelines for staffing jobs which were implemented prior to the incidents at issue. Those guidelines set forth the Company's hiring priority:

> Hiring priority will be as follows:
>
> A. Current Eldeco employees (transfers) with proven safety, attendance, performance and behavior records.
>
> B. Former Eldeco employees with proven safety, attendance, performance and behavior records.
>
> C. Applicants recommended by Eldeco employees, if otherwise qualified.

12

The termination report that Eldeco prepared was positive and stated that Eldeco would rehire Mr. Flood. Therefore, the ALJ's determination that Eldeco failed to consider Mr. Flood, Sr.'s application and also failed to hire him is entitled to deference. Accordingly, we do not disturb the ALJ's determination that Mr. Flood was discriminated against, however, we do limit his recovery to only those damages incurred prior to April 8, 1994.

B.

The Company also contends that it made valid offers of employment to some of the applicants. During June 1994, the Company called many of the applicants to inform them that Eldeco had jobs for them. The ALJ noted that the calls came after the unfair labor practice charge had been filed and were questionable as to whether they constituted offers of employment. The ALJ left this issue to the compliance stage of the proceeding. We modify that ruling slightly to limit any alleged damages to the date that an applicant was offered a job and did not accept it.

C.

Eldeco further challenges the NLRB's decision that Eldeco's refusal to hire Tom Flood, Jr., was based on discriminatory considerations. Tom Flood, Jr., was in high school when he applied with Eldeco on March 1, 1994, and was looking for part-time work as an apprentice.[4] Eldeco argues that, because Tom Flood, Jr., admitted in his testimony that he was not qualified or capable of performing the work of a helper, the Board's conclusion is erroneous. The Board noted this testimony, but concluded that Mr. Flood, Jr.'s lack of qualifications was not the reason for Eldeco's refusal to hire him; rather, the refusal was based on discriminatory considerations. The Board then left to the compliance stage of the proceeding the issues of

_____

D. Applicants with experience on similar projects, if otherwise qualified.

E. Unknown qualified applicants.

[4] Eldeco does not hire part-time electricians or helpers.

13

whether the admission should operate to preclude reinstatement and/or toll back pay. We disagree. An applicant who is admittedly not qualified to perform the job for which he applied could not have been damaged from a refusal to hire, whatever the reason. Accordingly, we preclude any reinstatement and toll any back pay.

VI.

We therefore enforce the Board's order with the exception of those provisions relating to Waco Cottingham, Stephen Pope, Tom Flood, Tom Flood, Jr.; the drug test policy, and the offers of employment. As to those matters, we deny enforcement.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART

HALL, Circuit Judge, concurring in part and dissenting in part:

To the extent the majority enforces the order of the Board, I concur in the judgment. To the extent it does not, I respectfully dissent.

I.

Winston-Salem

The sequence of events leading up to it leaves little doubt about Eldeco's motive for suddenly implementing drug testing of new hires at Winston-Salem; at the very least, the Board's finding of unlawful motivation has substantial support in the record, leaving us no choice but to affirm it. 29 U.S.C. § 160(e) (findings supported by substantial evidence are "conclusive").

Terry Christie was a foreman at the Winston-Salem jobsite. On July 14, he told employee Gregory Davis that the company was bringing in ten to twelve workers from South Carolina. Christie mentioned that local union men had applied for jobs, which prompted Davis to ask whether they were qualified. Christie admitted that they were, but continued, "We're not having no union men on this job. [Mastalz] won't hire union people on this job."

14

Christie and Davis had a less cordial encounter on July 23. Christie observed Davis talking to a new employee. Suspecting that Davis was a covert union sympathizer, Christie confronted him and asked whether Davis was pro-union. Davis revealed that he was. Christie immediately fired Davis.

The discharge of a worker solely on account of his pro-union sentiments is perhaps the most basic of all unfair labor practices. In protest, several employees immediately went on strike, and there was intermittent picketing. The union filed unfair labor practice charges on July 27.

Before the strike, Eldeco had never conditioned employment on a drug test and had, as the majority concedes, unlawfully refused to employ known or suspected union sympathizers. Within seven days of the strike, however, Eldeco had both implemented its drug testing policy and invited members of the union to come to work. Was this convergence of events simply a remarkable coincidence of a well-meaning safety improvement and a Grinch-like change of heart? Or, rather, was it simply a legal stratagem designed to enable Eldeco to continue to exclude union members and then, perhaps, to cut its losses before the Board or this court?

Surely it was rational for the Board to draw the latter inference. The timing of a policy change is powerful evidence of its unlawful purpose. See NLRB v. Village IX, Inc., 723 F.2d 1360, 1366 (7th Cir. 1983) (antiunion purpose behind facially neutral policy can be inferred from timing). Moreover, there is more than timing here. As I will discuss below, Mastalz expressly admitted to an employee and a prospective employee that the purpose of the drug testing was to "get rid of the union guys." This statement alone provides substantial support for the Board's factual finding of unlawful purpose.

If the purpose of a work rule is to suppress the exercise of section 7 rights, the employer has committed an unfair labor practice, notwithstanding that the rule is applied to pro- and anti-union alike. Standard-Coosa-Thatcher Carpet Yarn Div'n v. NLRB, 691 F.2d 1133, 1141-1143 (4th Cir. 1982). Why? Because every worker has section 7 rights, whatever his attitude at any given time toward collective representation. Heavyhanded retaliatory tactics like Eldeco's drug

15

testing are illegal not just because they may unfairly and coercively blunt a current organizational drive, but also because their example serves to squelch any incipient desires for representation in the existing workforce. Pillories and hangings were public for their salutary effects on witnesses, and many a saber has been rattled to keep the peace. A deliberate show of force is a deliberate exercise of force.

Even if it were essential to the policy's illegality that it be discriminatory, there is substantial evidence that it was. In August, Eldeco employee Tony Heath introduced Mark Luper to Mastalz and Christie. Heath needed a helper, and he recommended Luper. Heath told Mastalz that Luper was afraid he might fail the drug test. Mastalz replied that "the drug test was not to get rid of the drug users but to get rid of the Union guys and not to worry about it." Luper took the test and failed. There were no adverse consequences-- he was hired and permitted to continue to work.

In addition to this direct evidence of discrimination, the odd structure of the policy supports a finding of discriminatory motive. Eldeco proposed to test only new applicants, at a time that it believed that its existing workforce was non-union and that the union was trying to organize from outside.*

Moreover, we ought not -- and in my view, we cannot -- forgive Eldeco's illegal motivation because drug testing of electricians in Winston-Salem strikes us as a good idea. We have no role in setting the terms and conditions of private employment (other than, of course, those few actually prescribed by law, like minimum wages and maximum hours). It is quite beside the point that drug testing might be a "good safety device" or a "valid public policy decision." Supra at 8. The goodness and validity of work rules are in the eye of the employer, and their promulgation is its prerogative, with the one big exception relevant here: rules intended to interfere with employees' free exercise of § 7 rights are illegal.

_____

*Eldeco's policy also made an odd distinction among applicants: only those who applied directly would be tested, while those referred by a temporary employment agency would not. Again, one could infer that Eldeco did not expect union members to apply through an agency, and it designed its policy accordingly.

16

Because the drug testing policy violated the Act, the August 3 blanket offers of employment to union members were invalid: an offer conditioned on acquiescence in an unfair labor practice is no offer at all. Likewise, Pope and Cottingham's terminations were based on an illegal policy, rendering the terminations unlawful as well.

II.

North Charleston

The majority has not pruned quite so much from the Board's order regarding the North Charleston jobsite, but, in my view, those prunings are just as erroneous.

As to Flood, Jr., the majority has inappropriately reached out to address and resolve an issue that has not yet been resolved below. The Board found simply that the actual reason for Eldeco's failure to hire Flood, Jr., was its perception that he was for the union. The Board left completely open, however, whether Flood, Jr., was entitled to any remedy: "we leave to compliance whether [Flood, Jr.'s lack of qualifications] should operate to preclude reinstatement and/or toll back-pay." In a footnote, the Board noted that leaving the matter for compliance would allow "a further development of relevant facts."

I would enforce this logical approach. We know precisely why Flood, Jr., was not hired, and that reason is unlawful. Perhaps a responsible electrical contractor should not have hired him, but Eldeco's burden is higher: it must show that it would not have hired Flood, Jr., absent its illegal motivation. NLRB v. Transportation Management Corp., 462 U.S. 393, 400-403 (1983) (overruled in part on other grounds, Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994)). Unqualified persons are hired every day to positions high and petty. Those employees, however inept their job performance, have § 7 rights.

The majority also errs in limiting Flood, Sr.'s backpay to the period before he signed, under subpoena, an affidavit critical of Eldeco's work at another job. This affidavit was submitted to a state licensing agency in support of charges a third party had filed against Eldeco.

17

The essential premise of the majority's holding is that Flood, Sr., could have been fired for signing this affidavit had he been hired in the first place. I do not read the law that way:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted, or caused to be instituted, any proceeding under or relating to statutes, rules, or regulations regarding occupational safety and health, or testified, or is about to testify, in any such proceedings or because of the exercise by such employee on behalf of himself or others of any right afforded by such statutes, rules or regulations.

S.C. Code Ann. § 41-15-510 (1986). Eldeco's expressed willingness to violate this state law ought not be a defense to its violation of federal law.

I would enforce the Board's order in its entirety.

18