[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————

No. 97-8444

———————

NLRB Nos.     10-CA-2831-3
              10-CA-28422
              10-CA-28526
              10-CA-28628
              10-RC-14578


NATIONAL LABOR RELATIONS BOARD,

                                                                        Petitioner,

versus

McCLAIN OF GEORGIA, INC.,

                                                                        Respondent.

———————

Application for Enforcement of an Order of the
National Labor Relations Board

———————

(April 17, 1998)


Before BARKETT, Circuit Judge, GODBOLD and GOODWIN*, Senior Circuit Judges.

BARKETT, Circuit Judge:

      The National Labor Relations Board ("the Board") seeks enforcement of its order

_____
 *Honorable Alfred T. Goodwin, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by
designation.

essentially adopting a finding by the Administrative Law Judge ("ALJ") that respondent McClain of Georgia ("the Company") engaged in numerous unfair labor practices under the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA"), and ordering the Company to cease these practices and provide relief for employees harmed by the practices.

The Company manufactures solid waste containers at its Macon, Georgia facility. Kenneth McClain, the president and CEO of the Company, owns several other similar businesses in different states. The Macon plant employs about 50 employees, including some temporary employees who are eligible to become permanent workers after a 90-day probationary period.

The events giving rise to the Board's finding that the Company engaged in unfair labor practices took place in late 1994 and early 1995, when Company employees attempted to unionize. In November 1994, the union filed a petition with the NLRB seeking to become the certified union representative for the Company. In December 1994, the Board dismissed the union's petition on the ground that the bargaining unit would have to include the Company's temporary employees. On January 9, 1995, the union filed a second petition, this time including temporary employees in the proposed bargaining unit. The representation election took place on February 23, 1995. Eighteen employees voted for unionization, 21 voted against, and the Board challenged 10 ballots. Thereafter, the General Counsel for the Board filed complaints alleging that the Company and McClain engaged in a number of unfair labor practices during the unionization drive in an effort to intimidate and retaliate against employees for exercising their statutory rights to engage in union activities.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations [and] to bargain collectively through representatives of their

2

own choosing...." 29 U.S.C. § 157 (1988). Section 8(a)(1) of the Act makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1) (1988). An employer violates § 8(a)(1) when its actions would reasonably tend to coerce employees in the exercise of protected § 7 rights. See TRW-Greenfield Div. v. NLRB, 637 F.2d 410, 415-16 (5th Cir. 1981).[1] Section 8(a)(3) of the Act prohibits employer "discrimination in regard to hire or tenure of employment [so as] to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3) (1988). An employer violates § 8(a)(1) and (3) by taking adverse employment action or changing the terms or conditions of employment in retaliation for the union activities of its employees.

The ALJ found, and the Board affirmed, that the Company violated § 8(a)(1) of the NLRA by interrogating employees about their own union sympathies and the sympathies of other employees, by threatening employees with plant closure, by soliciting employees to spy on their co-workers' union activities, and by promising and granting benefits to employees to dissuade them from supporting the union. The Board also determined that the Company violated § 8(a)(1) and (3) of the Act by issuing warnings for attendance violations, by changing its drug testing policy and discharging those who tested positive for drugs, by laying off 19 employees, and by changing other policies, all in retaliation for union activity. Finally, the Board found that the Company violated § 8(a)(1) and (3) when it fired employee Aric Evans in retaliation for his union activities, and that the Company attempted to denominate Evans as a supervisor in order to

---

[1]The decisions of the former Fifth Circuit prior to October 1, 1981 are binding upon this court. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

avoid liability under the Act. The Board's order requires the Company to cease and desist from engaging in these unfair labor practices and directs the Company to offer full reinstatement with back pay to those employees who were discharged pursuant to the change in the Company's drug testing policy and to those employees who were laid off.[2]

The standard of review is simply to ensure that the decision of the Board is supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). This standard does not permit us to overturn a Board decision supported by substantial evidence even if we would reach a different conclusion were we to decide the case de novo. Purolator Armored, Inc. v. NLRB, 764 F.2d 1423, 1428 (11th Cir. 1985). We must also give special deference to the ALJ's credibility determinations, which will not be disturbed unless they are inherently unreasonable or self-contradictory. NLRB v. United Sanitation Serv., 737 F.2d 936, 938 (11th Cir. 1984).

On appeal, the Company specifically challenges the Board's findings regarding the treatment and discharge of Aric Evans, the layoffs, and the drug testing and related discharges. Although the Company does not address in particular the Board's other findings, the Company makes the general assertion that the Board's order in its entirety is not supported by substantial evidence. The Board responds that because the Company failed to present specific arguments with regard to the Board's remaining findings of unfair labor practices, including the § 8(a)(1) violations, the Board is entitled to summary affirmance on these issues. See Purolator Armored,

---

[2]The Board also ordered a recount of the ballots cast at the union election. The Company challenges the Board-ordered recount on appeal. As the Board correctly points out, however, we lack jurisdiction in this appeal to review the Board's decisions regarding representation matters. See Florida Bd. of Business Regulation v. NLRB, 686 F.2d 1362, 1366 n.8 (11th Cir. 1982); Raley's, Inc. v. NLRB, 725 F.2d 1204, 1205-1206 (9th Cir. 1984) (en banc).

764 F.2d at 1427-28 (where respondent company does not raise arguments on appeal as to certain findings, summary affirmance on those findings is appropriate). Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived. See Continental Tech. Serv., Inc. v. Rockwell Int'l Corp., 927 F.2d 1198, 1199 (11th Cir. 1991); Fed. R. App. P. 28(a)(4). Although the Company fails to address with particularity the remaining findings by the Board, when we read its briefs liberally, we find, with one exception,[3] that the Company has not waived its challenges to these findings. We further note that the Board addressed many of these issues in its brief, so it cannot complain that it lacked notice of these issues or that it was hindered in its ability to respond. See Federal Savings and Loan Ins. Corp. v. Haralson, 813 F.2d 370, 373 n.3 (11th Cir. 1987).

After careful scrutiny of the record, however, we conclude that the Board's findings regarding the Company's interrogation of employees, solicitation of spying, solicitation of grievances and promises of benefits, and threats of plant closures, all violations of § 8(a)(1), are well supported by substantial evidence in the record. The Company essentially attacks the credibility determinations of the ALJ with regard to these findings. We do not find anything in the ALJ's order that suggests that its credibility determinations were self-contradictory or unreasonable, and therefore we will not question the decisions made by the ALJ as to which

_____

[3]The ALJ found, and the Board agreed, that the Company violated the Act by changing its seniority policy when it recalled some of the laid off workers, and by changing its evaluation and attendance policies following the union election, all in retaliation for the union campaign. In contrast to the other findings not specifically challenged by the Company, the Company does not mention these violations anywhere in its briefs, and the Board only mentions them in passing. We conclude, therefore, that the Board is entitled to summary affirmance on these findings. We note, nonetheless, that there is evidence in the record to support the Board's decision as to these issues.

witnesses to believe or disbelieve.  See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1010 (4th Cir. 1997) ("Contrary to the Company's suggestion, bias is not established merely because an ALJ uniformly credits one party's witnesses over another's.")  Indeed, the ALJ carefully explained his reasons for making each credibility determination, based upon such factors as conflicts between the testimony of a witness and other evidence, witness demeanor, self-interest, and any possible influences on the witness.

We next turn to the findings specifically challenged by the Company.  The Company first argues that the Board erroneously concluded that Aric Evans was not a supervisor within the meaning of the Act, and that the Company was liable under the Act for discharging Evans the day before the union election.  After carefully reviewing the entire record, we likewise conclude that substantial evidence supports the Board's finding that the Company attempted to designate Evans as a supervisor in order to remove him from the protection of the NLRA when, in fact, Evans was an employee, and that the Company discharged Evans to retaliate against him for his union activity and to send a message to the other employees, and not because Evans had made an allegedly threatening remark.

We next turn to the Company's assertion that the Board erred in finding that the Company violated § 8(a)(1) and (3) when it laid off 19 employees during the union campaign. The Company contends that the layoffs were necessitated by a sudden drop in orders from one of its major customers, Baker Tanks, Inc.  Other evidence in the record, however, suggests that the real motivation behind the layoffs was anti-union animus on the part of the Company.  For example, according to the testimony of numerous employees, credited by the ALJ, Kenneth McClain held at least two meetings with employees shortly before and after the Christmas

6

holiday of 1994 in which he stated that, although work was slowing down, there would be no resulting layoffs and that he would move work from other plants or "stock the yard" with inventory to keep up production and avoid any layoffs. These meetings took place after the Board dismissed the union's first petition to be certified as the employees' bargaining representative. On January 9, 1995, the union filed its second petition. Shortly thereafter, on January 18, 1995, McClain announced the layoffs of 19 employees. The ALJ credited the testimony of employees Aric Evans and Cedric Craig that before the layoffs were announced they overheard McClain angrily state, "I'm getting rid of the people in the shop. I'm going to show them who is boss around here. I'm going to show them who they're fucking with." McClain then announced the layoffs, which were made according to seniority within each work group. The ALJ also credited testimony by Evans that immediately after the layoff announcement, McClain told Evans to go onto the shop floor and tell employees who supported the union that McClain would close the plant, and that he was "not playing games."

The Company argues that the fact that most of the laid-off employees were not known union supporters militates against a finding that the layoffs were made in retaliation for union activity. In order to establish a violation of § 8(a)(3) of the Act, the General Counsel for the NLRB must usually show that an employee was discharged because of his or her union activity. See United Sanitation Serv., 737 F.2d at 939; NLRB v. Vemco, Inc., 989 F.2d 1468, 1477-78 (6th Cir.1993). The General Counsel may also prevail, however, under the theory that an employer ordered mass or general layoffs "for the purpose of discouraging union activity or in retaliation against its employees because of the union activities of some." Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1180 (6th Cir. 1985); see also Alpo Petfoods, Inc. v.

7

NLRB, 126 F.3d 246, 255 (4th Cir. 1997); Davis Supermarkets, Inc. v. NLRB, 2 F.3d 1162, 1168

(D.C. Cir. 1993); Ballou Brick Co. v. NLRB, 798 F.2d 339, 342 (8th Cir. 1986); Dillingham

Marine & Mfg Co. v. NLRB, 610 F.2d 319, 321 (5th Cir. 1980).  In Dillingham, the former Fifth

Circuit stated:

> Common sense dictates that when employees are discharged for individual reasons, then
> the employer's knowledge of each employee's union activity and the employer's
> motivation for each discharge are the relevant inquiries; but when an employer makes a
> single decision to fire 15 people to "discourage membership in any labor organization,"
> then the relevant inquiry is the employer's motivation for that single decision.

610 F.2d at 321.

To determine whether anti-union animus was the motivating factor behind an employer's

decision to take adverse employment action, courts and the Board analyze the decision under the

Wright Line test.  In NLRB v. Transportation Management Corp., 462 U.S. 393 (1983), the

Supreme Court approved the NLRB's test for determining motive in discharge cases as set forth

in Wright Line, a Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced on other

grounds, 662 F.2d 899 (1st Cir. 1981).  This circuit has described the test as follows:

> [Wright Line] mandates three phases of proof.  First, the General Counsel must show by
> a preponderance of the evidence that a protected activity was a motivating factor in the
> employer's decision to discharge an employee.  Such a showing establishes a section
> 8(a)(3) violation unless the employer can show as an affirmative defense that it would
> have discharged the employee for a legitimate reason regardless of the protected activity.
> The General Counsel may then offer evidence that the employer's proffered "legitimate"
> explanation is pretextual--that the reason either did not exist or was not in fact relied
> upon--and thereby conclusively restore the inference of unlawful motivation.

Northport Health Serv., Inc. v. NLRB, 961 F.2d 1547, 1550 (11th Cir. 1992) (quoting Sanitation

Serv., 737 F.2d at 939).

Motive is a question of fact, and the Board may rely upon direct and circumstantial

evidence to infer anti-union motive.  Purolator Armored, 764 F.2d at 1428-29.  Factors which

8

may support an inference of anti-union motivation include an employer's expressed hostility toward unionization coupled with knowledge of ongoing union activity, other unfair labor practices committed by the employer contemporaneous with the adverse action, the timing of the adverse action in relation to union activity, the employer's reliance on pretextual reasons to justify the adverse action, disparate treatment of employees based on union affiliation, and an employer's deviation from past practice. See Vemco, 989 F.2d at 1479; Purolator Armored, 764 F.2d at 1429.

Based upon the Company's numerous § 8(a)(1) violations (including a threat made by Kenneth McClain that he would shut the plant down and make it look like economic troubles were the cause), McClain's switch from promising no layoffs before the union filed its second petition to instituting a massive layoff within a week of the filing, and the statements overheard by Evans and Craig immediately before the layoffs were announced, the ALJ found that the General Counsel had made out a prima facie case that the real motivation behind the layoffs was anti-union animus. The ALJ then rejected the Company's proffered economic reasons as pretextual, noting that the Company knew as early as November 15, 1994 that it had received the last of the Baker Tanks orders, but that six weeks later McClain assured employees that he would not being making layoffs. The ALJ further noted that none of the other McClain plants that relied on Baker Tanks orders was required to make layoffs. Because the Company had not shown any change in economic circumstances between the time McClain made the "no layoffs" assurances and the time he laid off 19 employees, the ALJ concluded that the only intervening event that could explain the change in Company position was the union's filing of the second petition.

9

In this case, as in many, the record contains evidence that could support findings of both a lawful and an unlawful motive for the Company's decision to make the layoffs. See NLRB v. Malta Constr. Co., 806 F.2d 1009, 1012 (11th Cir. 1986). Our standard of review is limited, however, to determining whether the Board's inference of unlawful motive is supported by substantial evidence--not whether it is possible to draw the opposite inference. See NLRB v. Aquatech, Inc., 926 F.2d 538, 547 (6th Cir. 1991) ("While the ALJ's conclusion is not the only plausible inference that can be drawn from the record, and is not necessarily the inference we would draw, it was certainly a permissible one."). We conclude that there is substantial evidence in the record such that a reasonable person could draw the conclusion that the layoffs were ordered in retaliation for union activity.

Furthermore, we reject the Company's argument that the decision in Northport warrants reversal in this case because the ALJ in this case, like the ALJ in Northport, failed properly to weigh the defendant's proffered legitimate reasons under the second and third prong of Wright Line. See Northport, 961 F.2d at 1551-52. In Northport, this court held that the ALJ's failure to explain adequately its reasons for rejecting the employer's proffered reasons for terminating eight employees, in the context of conflicting circumstantial evidence regarding the employer's motivation for the firings, required reversal and remand. Id. In contrast, the ALJ in this case acknowledged that the Company had produced evidence showing a non-discriminatory reason for the layoffs--the cutoff in Baker Tanks orders--but concluded that this reason was not the real reason for the layoffs. Unlike the ALJ's decision in Northport, the ALJ in this case considered the Company's purported reasons and explicitly set forth his reasons for rejecting them as pretextual. The Board adopted this analysis and, for the reasons discussed above, we find that it

10

is supported by substantial evidence.[4]

The Company also challenges the Board's finding that the Company violated § 8(a)(1) and (3) when it changed its drug testing policies and discharged eight employees who tested positive under the new policies. Until early 1995, the Company maintained a policy of administering drug tests to those temporary employees who had completed the 90-day probationary period and were eligible to be placed on the Company payroll. According to testimony credited by the ALJ, prior to the time in question, the Company was lenient in its enforcement of the drug policy, permitting employees who tested positive for drugs to be retested, and giving some employees with known drug and alcohol problems the chance to remedy those problems without facing discharge. Nothing in the record shows that any Company employee was previously fired based upon a one-time positive drug test.

On January 16, 1995, however, McClain denied the opportunity for a retest to Kenneth Swayne, a temporary employee who had finished his probationary period and who tested positive for drugs, and Swayne was terminated.[5] On February 1, 1995, the Company ordered

---

[4]The Company also challenges the Board's remedy of ordering reinstatement with back pay to the 19 employees laid off in violation of the Act. The Company argues that it should be afforded an opportunity to show that this remedy is unduly burdensome and that the employees would have been eventually laid off even absent any unfair labor practices by the Company. The Company will be given such an opportunity to challenge the Board's remedies in separate compliance proceedings. See, e.g., Dean Gen'l Contractors, 285 N.L.R.B. 573 (1987).

[5]According to Swayne's testimony, he first learned that he had tested positive for the presence of marijuana from supervisor Tim Hall. When Swayne vigorously denied that he had used drugs, Hall told Swayne that he would be retested. A few hours later, however, Swayne ran into McClain talking with Hall and office manager Carol Kitchens, who told McClain about Swayne's positive drug test results. When Hall stated that he was going to have Swayne retested, McClain objected vehemently and Swayne was terminated.

that all employees be tested for drugs.[6]  The seven employees who tested positive were immediately discharged, without being given an opportunity to be retested.  Four of the eight employees discharged under the new "zero tolerance" drug policy had no known connection to the union. The ALJ credited the testimony of Larry Trice that he overheard supervisor Hall telling Dennis Scruggs, one of the employees discharged after the February 1 test, "not to worry about it," and that if Scruggs waited 60 to 90 days until "all this Union stuff blows over," he could reapply and would be rehired.[7]

We find that the Board's conclusion that the Company violated § 8(a)(1) and (3) by

---

[6]According to the testimony of McClain and other Company management personnel, the decision to order company-wide drug testing and to impose a "zero tolerance" policy was based upon an incident on January 27, 1995, in which a temporary employee who tested positive purportedly told a Company supervisor that he should have stopped using drugs in time to avoid detection by the drug test.  In response, McClain ordered that all employees be tested a few days later.  Although this explanation might provide a non-retaliatory reason for the decision to test all Company employees on February 1, it fails to show a legitimate reason for McClain's decision to change the Company practice of allowing retesting beginning January 16, 1995.

[7]The ALJ also found that, following the initial round of company-wide testing, one known union supporter was discharged without being given a second test, while another employee, who was not known to support the union, was retested and was not discharged.  The ALJ found these incidents evidence of a discriminatory application of the Company's drug testing policy.  The Company argues that the circumstances surrounding the drug testing of these two employees were substantially different.  After the known union supporter, Glen Norwood, tested positive, he told his supervisor that he had "smoked a joint" that previous weekend.  In contrast to Norwood's clear admission of drug use, the Company argues, employee Gene Wilson was tested at a different facility from the one that performed the February 1 company-wide test, the presence of drugs in Wilson's system was very low, and Wilson denied use of drugs, so that the Company did not think it was fair to discharge Wilson on the basis of the first test.  Because the ALJ failed to explain why it rejected the Company's proffered reasons for the different treatment of Norwood and Wilson, substantial evidence does not support the ALJ's statement that the Company's drug testing policy was applied disparately against union supporters.  See Northport, 961 F.2d at 1552.  We note, furthermore, that Norwood is not one of the aggrieved employees listed in the Board's complaint.  The fact  that the Company allowed Wilson to be retested at all, however, detracts from the Company's assertion that the eight other employees were not allowed the opportunity for retesting because of the Company's new "zero tolerance" drug policy.

12

changing its previous practice of allowing retesting, and by discharging eight employees under the new policy, is supported by substantial evidence. Courts have long recognized that initiation of new workplace rules or a change in existing rules in retaliation for union activity violates § 8(a)(1) and (3) of the Act. See Gold Coast Restaurant Corp. v. NLRB, 995 F.2d 257, 267-68 (D.C. Cir. 1993) (canvassing other precedents holding that initiation of new discipline system in retaliation for union activity violates the Act); NLRB v. Frigid Storage, Inc., 934 F.2d 506, 510 (4th Cir. 1991) (noting that retaliatory change in working conditions violates § 8(a)(1) and (3)); Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1334-35 (7th Cir. 1978) (holding that evidence supported finding that employer instituted new warning system to retaliate against the union). Although employers must be allowed to enforce their disciplinary rules, where an employer begins to enforce strictly a previously lax system of rules in retaliation for union activity or enforces rules selectively to discriminate against union supporters, the employer's affirmative defense that the action was non-discriminatory is less tenable, and courts will uphold a finding of unfair labor practices. See Carry Companies of Ill. v. NLRB, 30 F.3d 922, 929 (7th Cir. 1994) (acknowledging that, "where an employer establishes a regular pattern of overlooking certain violations of company policy, the employer may not later rely on such violations to satisfy its burden under Wright Line."); NLRB v. Del Rey Tortilleria, Inc., 787 F.2d 1118, 1124-25 (7th Cir. 1986) (same).

In this case, substantial evidence supports the Board's conclusion that the Company changed its previous position of allowing retesting in retaliation for the union activity at the Macon plant. Although not in itself dispositive, the timing of a policy change may constitute evidence that the change was motivated by anti-union animus, rather than a legitimate business

13

reason.  See, e.g., International Brotherhood of Boilermakers v. NLRB, 127 F.3d 1300, 1307 (11th Cir. 1997).  Together with the § 8(a)(1) violations and the other evidence of anti-union animus on the part of the Company and McClain personally, the fact that the Company changed its practice regarding retesting shortly after the union filed its second petition supports the inference drawn by the Board that the change was instituted as part of the Company's concerted effort to retaliate against union activity at the plant.  Perhaps most importantly, the Company failed to present any evidence suggesting a legitimate business reason for its changed decision not to allow retesting.  While of course we do not dispute the value of the goal of eliminating drugs from the workplace, we find that the Board justifiably concluded that, in light of the Company's past leniency in enforcing its anti-drug policy and its previous willingness to allow employees who tested positive for drugs to be retested, that goal was not the real reason behind the policy change.

We emphasize that it is the Company's sudden change from its previous practice of allowing retesting that violated the Act, not the Company's general policy of testing its employees for drugs.  As the ALJ in this case noted, drug testing carries with it the real possibility of false positive results.  The possibility of false positives was implicitly acknowledged by the Company through its past practice of double-checking drug testing results.  In any event, while the Company is generally free to structure its drug testing policy in any manner it wants, it may not do so for the illegal purpose of retaliating against the union activities of its employees.

We note that the Fourth Circuit has recently refused to enforce a Board order finding that a new drug testing policy implemented by an employer during a union campaign violated §

8(a)(1).  Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011-12 (4th Cir. 1997).  In Eldeco, the employer began drug testing all new applicants for work at a construction site one week after the union instituted a strike and filed an unfair labor charge with the NLRB.  According to testimony credited by the ALJ, a supervisor for Eldeco told one employee that "the purpose of the drug test policy was to get rid of 'union guys,' not drug users."  Id. at 1011.  The court acknowledged that substantial evidence "facially" supported the inference that Eldeco's drug testing policy was implemented in retaliation for union activity among its employees.  Noting that the drug testing policy served a valid employer interest of fighting drug abuse in the workplace, however, and that there was no evidence that the policy had been disparately enforced, the court in Eldeco rejected the Board's ultimate conclusion that implementation of the policy violated § 8(a)(1).  Id. at 1012.

As in Eldeco, the changed drug retesting policy in this case resulted in the discharges of known union supporters and employees whose union sympathies were unknown.  In contrast to the court in Eldeco, however, we conclude that the fact that four of the discharged employees were not known to be pro-union does not mean that the Company's about-face in allowing drug retesting was not discriminatory within the meaning of the Act.  As with layoffs, discharges based upon purported disciplinary rules may violate the Act even if employees who oppose or are neutral toward the union are discharged along with union supporters.  See Hyatt Corp. v. NLRB, 939 F.2d 361, 375 (6th Cir. 1991); Standard-Coosa-Thatcher Carpet Yarn Div'n v. NLRB, 691 F.2d 1133, 1142-1143 (4th Cir. 1982).  Widespread discharges during a union campaign may have the effect of both removing employees from the voting pool and sending a powerful message of deterrence to other potential union supporters.  See ARA Leisure Serv., Inc.

15

v. NLRB, 782 F.2d 456, 462 (4th Cir. 1986). The focus in these types of cases must be on the motivating force behind the employer's single decision to make a unilateral change in the enforcement of its disciplinary system. Cf. Dillingham, 610 F.2d at 321. In other words, the question is whether the employees would have been fired in any event, even without the presence of union activity. The ALJ determined that the Company failed to show a legitimate non-discriminatory reason for the changes in its drug testing practices. In light of the fact that, prior to the union campaign, the Company consistently allowed employees who tested positive for drugs to be retested and to remain on the job, we hold that the Board was justified in concluding that the employees would not have been immediately discharged under the Company's normal drug testing policies, and that, therefore, they would not have been fired absent the Company's anti-union motivation in changing the retesting practice.[8]

For the foregoing reasons, the Board's petition to enforce its order is GRANTED.

---

[8]We underscore that our holding does not mean that an employer can never institute a new drug testing policy, or revamp ineffective past policies, during a union campaign. Here, however, the Company suddenly changed its practice of allowing retesting without giving any notice to the employees of the change, and the Company has failed to point to any evidence in the record substantiating a legitimate business reason for the change. In contrast, where an employer changes its drug testing policies or practices for reasons unrelated to union activities, factors such as evidence of adequate and advance notice to employees of the change and other evidence in the record of the valid reasons for the change will support a finding that the employer did not act in a retaliatory or discriminatory manner.