**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

HARTLEY OIL COMPANY,
INCORPORATED,
Respondent.

No. 99-1224

On Application for Enforcement of an Order
of the National Labor Relations Board.
(9-CA-33372-4)

Argued: March 3, 2000

Decided: March 27, 2000

Before WILKINSON, Chief Judge, and WILLIAMS
and MOTZ, Circuit Judges.

_____

Application for enforcement granted by unpublished per curiam opin-
ion.

_____

**COUNSEL**

**ARGUED:** Mark Evan Heath, HEENAN, ALTHEN & ROLES,
Charleston, West Virginia, for Hartley Oil. Joan Elizabeth Hoyte,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Board. **ON BRIEF:** Anna M. Dailey, HEENAN, ALTHEN &
ROLES, Charleston, West Virginia, for Hartley Oil. Frederick L.
Feinstein, General Counsel, Linda Sher, Associate General Counsel,

Aileen A. Armstrong, Deputy Associate General Counsel, Fred L. Cornnell, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Hartley Oil Company, Inc., located in Ravenswood, West Virginia, repackages and warehouses plastic products produced by other companies. Hartley's facility includes three buildings: a rail building, where employees wash rail cars and repair them; a warehouse where employees repackage and store plastic products; and an "extruder" building where employees melt down fiber into plastic.

On November 17, 1994, Hartley hired Leon Simms as a laborer to work in the rail building. Three months later, Simms dislocated his shoulder, and the company transferred him to the warehouse. In May 1995, the company transferred Simms back to the rail building. On June 14, 1995, several weeks after returning to the rail building, Simms fell in the parking lot and cut his hand. His doctor gave him a note requiring him to stay "off heavy work 4-6 w[ee]ks," and when he returned to work on June 20 the company assigned Simms to the warehouse. Simms testified, and the Board found, that company supervisors told him at this time that he "wouldn't be going back to the rail building" but instead "would be staying [at the same hourly rate ($5.00)] in the warehouse."

In July 1995, the Oil Chemical and Atomic Workers International Union, AFL-CIO, began an organizing drive at Hartley. Simms signed the union's representation petition on August 16 and began attending union meetings. On August 28, 1995, Simms wore a union button on his hat at work in the warehouse. Simms testified that a

2

supervisor, Bruce Speece, saw Simms with the button,"closed his eyes and put down his head and shook his head." Speece returned to his office, which he shared with warehouse manager Doug Moore, and fifteen minutes later the company ordered Simms to transfer to the rail building.

Company records indicate that in the four weeks prior to this August transfer from the warehouse to the rail building, Simms worked 52.50 hours, 57.25 hours, 47.75 hours, and 45.50 hours, while in the three weeks after this transfer he worked 37.25 hours, 33.50 hours, and 23.00 hours. The company records also reveal that during the weeks immediately after Simms' transfer, laborers in the warehouse continued to work substantial overtime, and that even the laborers in the rail building, other than Simms, worked numerous overtime hours. The other employees working in the rail building were able to work overtime although work in the rail building was"sporadic" during this time in part because of a company practice, not followed in Simms' case, of permitting employees to work in one building (e.g., the warehouse) if work in another (e.g., the rail building) was slow.

In mid-September, Simms, concerned about his dwindling hours, asked Bernard Lyons, a Vice President at Hartley, how many hours he could expect to be able to work in the future. Lyons noted that another rail building employee had just been laid off and told Simms that his hours would not be increasing. Lyons suggested that Simms take a "voluntary layoff" to receive full unemployment benefits, and Simms accepted the layoff. The remaining laborers in the rail building worked an average of over 20 overtime hours a week for the six weeks following Simms' layoff. Hartley hired two new laborers in November 1995 and another two in December 1995. Thus within three months after laying Simms off, the company hired four new laborers.

On December 8, 1995, Simms filed a charge against Hartley with the National Labor Relations Board. On February 29, 1996, the Board issued a complaint alleging that Hartley had discriminatorily transferred Simms, reduced his hours, and discharged him because of anti-union animus; that Hartley had coercively interrogated another employee about union activities at Hartley; and that Hartley's no-solicitation policy was unlawfully broad. After hearing testimony and

considering substantial documentary evidence, the ALJ issued findings of fact, conclusions of law and a recommended order, dismissing the coercive interrogation charge but finding that Hartley discriminated in transferring Simms, reducing his hours, and laying him off in violation of § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1998), and that Hartley's no-solicitation policy was unlawfully broad in violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). The Board adopted the ALJ's recommended order and its findings of facts and conclusions of law. Hartley Oil Co., 326 NLRB No. 97 (September 25, 1998). The Board applies for enforcement of the order, and Hartley challenges it.

Hartley's principal contention is that the Board's decision is based on insufficient evidence. The testimony of company witnesses did conflict with that of Simms on several issues. Most significantly, Hartley witnesses maintained that the company transferred Simms in late August because at that time another employee fell ill. They testified that Simms, who had been hired as a rail building employee, had been assigned to the warehouse only temporarily while his hand healed and so was the natural replacement. The ALJ instead relied on Simms' alternative testimony to find that because Hartley management believed Simms was "accident prone," they had permanently transferred him to the warehouse in June, ordering that he "not be allowed near" the washing operations of the rail building. The ALJ further found that Hartley's late August transfer of Simms from his permanent assignment at the warehouse to the rail building and the company's subsequent reduction in hours and lay off of Simms was motivated by anti-union animus in response to Simms' support of the union. The Board adopted these factual findings.

As the company recognizes, if substantial evidence supports the Board's factual findings, we must defer to those findings as "conclusive." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951); 29 U.S.C. § 160(e) (1998). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." Id. When the record contains such evidence we must respect the Board's findings "even though we might have reached a different result had we heard the evidence in the first instance." Alpo Petfoods, Inc. v. N.L.R.B., 126 F.3d 246, 250 (4th Cir. 1997) (internal quotations omitted).

4

Simms' testimony certainly provides evidence that a "reasonable mind might accept as adequate," Universal Camera, 340 U.S. at 477. Moreover, although the company has consistently maintained that it acted with no anti-union animus, its records and witnesses corroborated Simms' story in significant respects. Hartley supervisor Speece admitted that he saw Simms with the union button, and the company conceded that it transferred Simms to the rail building in late August when work there was "sporadic." Company records indicate that Simms' work hours rapidly decreased after he wore the union button, while those of other similarly situated employees did not. Anti-union motive may be established by just such circumstantial evidence. See FPC Holdings, Inc. v. N.L.R.B., 64 F.3d 935, 943 (4th Cir. 1995). Moreover, evidence of the timing of an employment action close to a union-relevant occurrence can constitute substantial evidence to uphold the Board's finding of discriminatory motive. See id. at 943-44; N.L.R.B. v. S.E. Nichols, Inc., 862 F.2d 952, 957 (2d Cir. 1988), cert. denied, 490 U.S. 1108 (1989). See also N.L.R.B. v. Nueva Eng'g, Inc., 761 F.2d 961, 968-69 (4th Cir. 1985).

Hartley contends, however, that we must entirely discount the Board's findings because inconsistencies in Simms' testimony constitute the kind of "exceptional circumstances" that permit a reviewing court to disturb the Board's findings. See Fieldcrest Cannon, Inc. v. N.L.R.B., 97 F.3d 65, 69-70 (4th Cir. 1996). In support of this assertion Hartley points for example to inconsistencies as to some of the dates in Simms' testimony, the sequence of events involving Simms' punching out for the last time, and the exact day Simms began to wear a union button on his hat. The difficulty with this argument is that these inconsistencies simply do not reach the central facts as to the timing of Simms' transfer and his subsequent layoff. We defer to the credibility determinations made by the factfinder when the inconsistencies in a witness's testimony do not go to the "heart" of the testimony. See Minyard Enter. v. Southeastern Chem. & Solvent Co., 184 F.3d 373, 381 (4th Cir. 1999). Indeed, given the frequency with which witnesses provide inconsistent testimony, to hold that minor inconsistencies justify a reviewing court's reversal of the Board's finding would effectively eviscerate the deferential standard of review established by both statute and well-settled case law. See Universal Camera, 340 U.S. at 477; 29 U.S.C. § 160(e).

5

The company also contends that we should refuse to enforce the Board's order because the ALJ was biased against it. Hartley offers no evidence other than a statistical analysis of the number over the years of employer witnesses that the ALJ has credited compared to the number of employee witnesses the ALJ has credited. We have squarely held that "this type of statistical argument is irrelevant." Eldeco, Inc. v. N.L.R.B., 132 F.3d 1007, 1010 (4th Cir. 1997). Such statistics tell us "little or nothing" about an ALJ's impartiality, id. (quoting Fieldcrest Cannon, 97 F.3d at 69) (internal quotations omitted), and we decline to overrule that sound precedent.

Finally, on one hand Hartley concedes that it "will not contest" the Board's no-solicitation order, but on the other argues that the order is moot. If Hartley is pressing mootness, we reject its contention. "[To] obviate[] the need for additional remedial action," an employer's repudiation or disavowal of prior unlawful policies or conduct "should give assurances to employees that in the future their employer will not interfere with the exercise of their . . . rights" to organize. See Passavant Mem'l Area Hosp., 237 NLRB 138, 138-39 (1978). Furthermore, "there must be adequate publication of the repudiation to the employees involved and there must be no proscribed conduct on the employer's part after the publication;" the repudiation or disavowal also "must be timely, unambiguous, specific in nature to the coercive conduct, and free from other proscribed illegal conduct." Id. (internal quotations omitted). Hartley does not claim that its old no-solicitation policy was legal. It issued a new no-solicitation policy on March 1, 1996, months after Simms left the company and several weeks after the complaint was issued in this case. The company provided no evidence that it gave specific assurances that it would not enforce its old, overbroad policy, nor has it offered evidence of the adequacy of its publication of the new policy. The need for the Board's order regarding the no-solicitation is, therefore, not moot.

APPLICATION FOR ENFORCEMENT GRANTED

6